# In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-3089

CHIEF ANTHONY ENAHORO, DR. ARTHUR
NWANKWO, FEMI ABORISADE, OWENS WIWA,
C.D. DOE, CHIEF GANI FAWEHINMI, and HAFSAT
ABIOLA, individually and on behalf of the estate
of her deceased father CHIEF M.K.O. ABIOLA,

*Plaintiffs-Appellees*,

*v.*

GENERAL ABDULSALAMI ABUBAKAR,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 C 6093—**Matthew F. Kennelly**, *Judge.*

———————

ARGUED JANUARY 10, 2005—DECIDED MAY 23, 2005

———————

Before CUDAHY, KANNE, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* A courtroom in Chicago, one would
think, is an unlikely place for considering a case involving
seven Nigerian citizens suing an eighth Nigerian for acts
committed in Nigeria. It sounds like the sort of fare that
would be heard in a courtroom on the African continent.
But this case ended up in Chicago, and that leads us to

consider the claims of seven Nigerian citizens against a Nigerian general over alleged torture and murder in Nigeria. The path the plaintiffs are pursuing is, as we shall see, quite thorny.

The plaintiffs make allegations of torture and killing at the hands of the military junta that ruled Nigeria from November 1993 until May 1999. The defendant, General Abdulsalami Abubakar, was a member of the junta and was Nigeria's head of state for the last year of the junta's reign. Alleging that he was behind the atrocities, the plaintiffs sued General Abubakar and claimed that the United States district court had jurisdiction under 28 U.S.C. §§ 1331 and 1350. The district court considered motions for dismissal and for summary judgment. The specific issue which gives rise to this interlocutory appeal is the decision that the Foreign Sovereign Immunity Act of 1976 (FSIA), 28 U.S.C. §§ 1602 *et seq.*, does not apply to individuals and thus General Abubakar is not immune from suit. The court determined, however, that General Abubakar is entitled to common law immunity for the year that he was head of state. Plaintiffs do not contest the latter finding.

The facts as we recite them come mainly from the plaintiffs' claims which, at this stage of the suit, we accept as true. The situation in Nigeria at the time of these events was unstable. On December 31, 1983, General Muhammed Buhari staged a military coup that overthrew Nigeria's democratically elected president and set off a series of coups and forced abdications. A number of military rulers were overthrown, one after another, and in June 9, 1998, defendant Abubakar assumed control of the regime following the sudden death of General Sani Abacha. Finally, a presidential election was held, and in May 1999, Nigeria had its first elected civilian president in 15 years.

During the various military regimes between 1983 and 1999, the highest governmental body was the Provisional Ruling Council (PRC). It was composed of military officials

and a few civilians; whoever was the current military ruler was the chairman of the PRC. According to the complaint, the PRC ruled by decree and curtailed civil liberties. During this time, Abubakar occupied the third highest military and political position in Nigeria.

Plaintiff Hafsat Abiola is the daughter of Nigerian pro-democracy activists; she claims that Abubakar is responsible for the deaths of her parents. Her father, M.K.O. Abiola, in fact, was a candidate for president in 1993. Plaintiff Abiola contends that the early election returns showed that her father won the vote, but the military regime nullified the election, leading to violent clashes between miliary forces and civilians. M.K.O. Abiola unsuccessfully challenged the election's nullification through the Nigerian court system and sought Nigerian and international support for the recognition of the election results. In June 1994, M.K.O. Abiola declared himself the president of Nigeria. He was promptly arrested and charged with treason. According to the complaint, he was kept in prison under inhumane conditions, was tortured, and denied access to lawyers, doctors, and his family. He died in prison in July 1998, shortly after General Abubakar assumed control of the military regime.

Plaintiff Abiola's mother, Alhaja Kudirat Abiola, was also a pro-democracy activist. After her husband was imprisoned she began a campaign to free him and continued a call for the democratization of Nigeria. The complaint alleges that she received menacing telephone calls warning her of the consequences of continuing to demand the release of her husband. In June 1996, she was murdered in broad daylight in her car on the streets of Lagos City. She had been shot multiple times.

Plaintiff Anthony Enahoro is a political activist who played a leading role in Nigeria's independence from Great Britain in 1960. In 1994, when he was 70 years old, he was arrested

and imprisoned by the junta for 4 months. During his detention he was not provided medical treatment even though he was a diabetic. Plaintiff Arthur Nwankwo, another political activist, was arrested in June 1998. He claims he was stripped naked, flogged, and taken away in the trunk of a car. He also was denied medical treatment for the 2 months he was in custody.

Based on these allegations, the complaint states seven claims: torture; arbitrary detention; cruel, inhuman and degrading treatment; false imprisonment; assault and battery; intentional infliction of emotional distress; and wrongful death.

As we said, General Abubakar appeals from the denial of immunity under the FSIA. The preliminary issue is whether we have appellate jurisdiction over the appeal. We conclude that we do.

We stated in *Rush-Presbyterian-St.Luke's Medical Center v. The Hellenic Republic*, 877 F.2d 574, 576 n.2 (7th Cir. 1989):

> Since sovereign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits, the denial of a claim of sovereign immunity is an immediately appealable interlocutory order under the "collateral order doctrine" of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 545-47, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949). *See Compania Mexicana de Aviacion, S.A. v. United States Dist. Court*, 859 F.2d 1354, 1358 (9th Cir. 1988) (per curiam); *Segni v. Commercial Office of Spain*, 816 F.2d 344, 347 (7th Cir. 1987).

Our is not an isolated opinion. *See S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292 (11th Cir. 2000); *In re Republic of Philippines*, 309 F.3d 1143 (9th Cir. 2002); *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 (D.C. Cir. 1997). That said, we turn to the appeal.

General Abubakar contends that he has immunity for official conduct taken while he was a Nigerian public official and a member of the ruling council. Underlying his argument is his contention that the FSIA applies to individuals in government, not just foreign governments and agencies.

The historical underpinnings of the FSIA go back almost 200 years. In *Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812), the Supreme Court recognized the immunity of foreign sovereigns from suits brought in the courts of the United States. Justice Marshall said that "as a matter of comity, members of the international community had implicitly agreed to waive the exercise of jurisdiction over other sovereigns in certain classes of cases, such as those involving foreign ministers or the person of the sovereign." *Republic of Austria v. Altmann*, 541 U.S. 677 (2004) (quoting *McFaddon*, 11 U.S. at 136). For the next 165 years, the executive branch decided whether a foreign nation was entitled to immunity. The usual procedure was that the State Department would provide the court with a "suggestion of immunity" and the court would dismiss the suit. *See* 15 Moore's Federal Practice, § 104.02 (Matthew Bender 3d ed.).

But in 1952, the State Department adopted what has become known as the "restrictive theory" of sovereign immunity. *Verlinden B. V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983). Under this theory, immunity is limited to suits involving the sovereign's public acts and does not extend to cases arising out of strictly commercial actions.

In 1976, Congress got into the act, passing the FSIA. Under the FSIA, a foreign state is "presumptively immune from the jurisdiction of United States courts . . . ." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). That immunity exists unless one of the statutory exceptions to immunity applies. *See* 28 U.S.C. §§ 1605 & 1607. Ironically, however, the FSIA is also the sole basis for jurisdiction over

a foreign state. Title 28 U.S.C. §§ 1604 and 1330(a) work together. Section 1330 confers jurisdiction when the state is not entitled to immunity under one of the exceptions in the FSIA. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).

In this case, no one contends that an exception to immunity applies. If Abubakar is covered by the FSIA, he is immune; no exception is relevant; and the suit would have to be dismissed. Therefore, the only issue is whether the statute applies to individuals, who are connected with the government, as opposed to the state itself and its agencies. We have recently looked at a similar question. *Ye v. Zemin*, 383 F.3d 620 (7th Cir. 2004), involved a head of state, and we concluded that the FSIA did not apply to heads of state: "The FSIA defines a foreign state to include a political subdivision, agency or instrumentality of a foreign state but makes no mention of heads of state." *Ye*, 383 F.3d at 625. We noted that the FSIA did not seem to subscribe to Louis XIV's not-so-modest view that "L'etat, c'est moi." How much less, then, could the statute apply to persons, like General Abubakar, when he was simply a member of a committee, even if, as seems likely, a committee that ran the country?

The language of the Act supports our conclusion. The overriding concern of the Act, as set out in 28 U.S.C. § 1602, is allowing judgments against foreign sovereigns "in connection with their commercial activities." The statute was passed so immunity determinations in such contexts would be made "by courts of the United States and of the States . . .", not by the executive branch of the government. Section 1604 provides that a "foreign state" is immune unless certain exceptions apply. Under § 1603(a), a foreign state includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state . . . ." In turn,

> (b) [a]n "agency or instrumentality of a foreign state" means any entity—(1) which is a separate legal person, corporate or otherwise, and (2) which is an

> organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title nor created under the laws of any third country.

The definition does not explicitly include individuals who either head the government or participate in it at some high level.

Abubakar argues, however, that "separate legal person" must mean an individual. We suppose it could. But if it was a natural person Congress intended to refer to, it is hard to see why the phrase "separate legal person" would be used, having as it does the ring of the familiar legal concept that corporations are persons, which are subject to suit. Given that the phrase "corporate or otherwise" follows on the heels of "separate legal person," we are convinced that the latter phrase refers to a legal fiction—a business entity which is a legal person. If Congress meant to include individuals acting in the official capacity in the scope of the FSIA, it would have done so in clear and unmistakable terms.

It is true, however, that this issue is a long way from being settled. The FSIA has been applied to individuals, but in those cases one thing is clear: the individual must have been acting in his official capacity. If he is not, there is no immunity. For instance, a Korean official being sued by a personal family employee was not immune because he was not acting within the scope of his official duties. *Park v. Shin*, 313 F.3d 1138 (9th Cir. 2002).

That same court, though, in *Chuidian v. Philippine National Bank*, 912 F.2d 1095, 1101 (9th Cir. 1990), looked at the statute and concluded that its language—the terms agency, instrumentality, organ, entity, and legal person— "while perhaps more readily connoting an organization or

collective, do not in their typical legal usage necessarily exclude individuals." Because Congress did not exclude individuals, the court concluded that if the individual was acting in his official capacity, the FSIA was applicable. We are troubled by this approach—that is, by saying Congress did not exclude individuals; therefore they are included. Not only does it seem upside down as a matter of logic, but it ignores the traditional burden of proof on immunity issues under the FSIA. The party claiming FSIA immunity bears the initial burden of proof of establishing a prima facie case that it satisfies the FSIA's definition of a foreign state. Then the burden of going forward shifts to the plaintiff to produce evidence that the entity is not entitled to immunity. The ultimate burden of proving immunity rests with the foreign state. *Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*, 293 F.3d 392, 397 (7th Cir. 2002); *Keller v. Central Bank of Nigeria*, 277 F.3d 811, 815 (6th Cir. 2002); *Virtual Countries, Inc. v. Republic of S. Africa*, 300 F.3d 230, 241 (2nd Cir. 2002).

A case which is similar to the one before us is *In re Estate of Ferdinand E. Marcos Human Rights Litigation*, 978 F.2d 493 (9th Cir. 1992). Archimedes Trajano, a student, went to an open forum in the Philippines where Imee Marcos-Manotoc—the daughter of Ferdinand Marcos, the former Philippine President—was speaking. Trajano apparently asked the wrong question at the forum and was kidnaped, interrogated, and tortured to death by military intelligence personnel who were acting in part under the authority of Marcos-Manotoc. A wrongful death suit, filed in the United States District Court for the District of Hawaii, followed, and a preliminary question was whether Marcos-Manotoc was entitled to immunity under the FSIA. Because Marcos-Manotoc was in default, she was said to have admitted that she acted on her own authority and not on the authority of the Republic of the Philippines. Therefore, she was not entitled to immunity. That also meant that there was also

no jurisdiction under the FSIA and that the Alien Tort Statute (ATS) was the sole basis for jurisdiction in the case.

In our case, we conclude, based on the language of the statute, that the FSIA does not apply to General Abubakar; it is therefore also clear that the Act does not provide jurisdiction over the case. If General Abubakar were covered, the FSIA would be the only basis for subject matter jurisdiction over him. As we indicated above, the Supreme Court has said in *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989):

> We think that the text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts.

The corollary proposition in *Argentine Republic* is that the Alien Tort Statute cannot provide jurisdiction over foreign sovereigns but remains a jurisdictional basis for suits against other defendants. And the ATS is, in fact, the basis on which plaintiffs in our case claim jurisdiction.

Because we are obligated to consider our jurisdiction at any stage of the proceedings, we now turn to the ATS as it forms a basis for jurisdiction in this case. The ATS provides that

> [t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

Our examination of the statute is particularly compelling at this time because recently (after the district court issued its decision in this case) the Supreme Court extensively considered the ATS. *Sosa v. Alvarez-Machain*, 124 S. Ct. 2739 (2004), established that the ATS is a jurisdictional statute that creates no new causes of action. The concept is not as simple as it sounds.

The *Sosa* case grew out of the capture in Mexico of a Drug Enforcement Administration agent who was taken to a house in Guadalajara, where he was tortured over the course of a 2-day interrogation and then murdered. DEA officials in the United States came to believe that Humberto Alvarez-Machain (Alvarez), a Mexican physician, was present at the house and acted to prolong the agent's life so that the interrogation and torture could be extended. Alvarez was indicted in the United States District Court for the Central District of California. The DEA asked the Mexican government to help obtain Alvarez's presence in the United States. When that failed, the DEA hired Mexican nationals, including Jose Francisco Sosa, to seize Alvarez and bring him to the United States from Mexico. Sosa and the others abducted Alvarez, held him overnight in a motel, and brought him by private plane to El Paso, Texas, where he was arrested by federal officers. Eventually, Alvarez went to trial, but the district court granted his motion for a judgment of acquittal. After returning to Mexico, Alvarez filed suit in the Central District of California against Sosa and others under the Federal Tort Claims Act, 28 U.S.C. § 2674, and the ATS.

As relevant here, Sosa argued that the action under the ATS should be dismissed because the statute merely provided the court with jurisdiction but did not authorize the courts to recognize any particular right of action without further congressional action. On the other hand, Alvarez argued that the statute was not simply a jurisdictional grant but was authority for the creation of a new cause of action for torts in violation of international law. The Court found that the statute was intended as jurisdictional "in the sense of addressing the power of the courts to entertain cases concerned with a certain subject." At 2755. But it also reasoned that when Congress enacted the statute in 1789, it did not enact a "stillborn" statute which could not provide a claim for relief without a further statute expressly

authorizing a cause of action. Examining international law at the time of enactment, the Court found that specific recognized violations of the law of nations were probably in the minds of the drafters of the ATS. These included safe conducts, infringement of the rights of ambassadors, and piracy. The Court stated:

> [A]lthough the ATS is a jurisdictional statute creating no new causes of action, the reasonable inference from the historical materials is that the statute was intended to have practical effect the moment it became law. The jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time.

At 2761.

But, the Court cautioned,

> there are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind. Accordingly, we think courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized.

At 2761-62.

In sum, "the judicial power should be exercised on the understanding that the door is still ajar subject to vigilant doorkeeping . . . ." At 2764.

Alvarez's case against Sosa was properly dismissed because a "single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary in-

ternational law so well defined as to support the creation of a federal remedy." At 2769.

Because the ATS provides jurisdiction over a very limited number of claims and the jurisdictional grant is so closely tied to the claim, we need to examine whether there is a claim in this case which allows for the exercise of jurisdiction. *See Kadic v. Karadzic*, 70 F.3d 232, 238 (2nd Cir. 1995) ("Because the Alien Tort Act requires that plaintiffs plead a 'violation of the law of nations' at the jurisdictional threshold, this statute requires a more searching review of the merits to establish jurisdiction than is required under the more flexible 'arising under' formula of section 1331.").

The plaintiffs before us allege significantly more appalling violations than did Alvarez. Their allegations fall into two primary categories that the *Sosa* Court specifically recognized as violations of the law of nations: torture and killing. The Court also noted that Congress has provided an "unambiguous" basis for "federal claims of torture and extrajudicial killing" in the Torture Victim Protection Act of 1991, 106 Stat. 73. *Sosa*, 124 S. Ct. at 2763.[1]

This would seem to be positive news for the plaintiffs. But that may not necessarily be so. In the district court, Abubakar argued that because the plaintiffs had not complied with the exhaustion requirement in the Torture Victim Protection Act, their case should be dismissed. The district judge rejected the argument because the plaintiffs had not pled their case under the Act and therefore had no need to comply with its requirements. The implication of the district court's decision is that there are two bases for relief against torture and extrajudicial killing: the statute and independently existing common law of nations condemning torture and killing. The issue, then, becomes whether

---

[1] Tellingly, the Torture Victim Protection Act is inserted in the United States Code under the Historical and Statutory Notes of the ATS (28 U.S.C. § 1350).

both can simultaneously exist to provide content to the ATS. In other words, does the Torture Victim Protection Act occupy the field or could a plaintiff plead under the Act and/or under the common law?

We find that the Act does, in fact, occupy the field.[2] If it

---

[2]  The dissent cites *Kadic* for the proposition that the "scope of the Alien Tort Act remains undiminished by enactment of the Torture Victim Act." The court, however, made this pronouncement as a gloss on H.R. Rep. No. 367, 102d Cong., 2d Sess., at 4 (1991), which stated that

> (c)laims based on torture and summary executions do not exhaust the list of actions that may appropriately be covered [by the Alien Tort Act]. That statute should remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law.

The latter statement does not, we think, necessarily say that there are now two routes for claims based on torture and killing to take. Rather, it indicates that the enactment of the Torture Victim Protection Act did not signal that torture and killing are the *only* claims which can be brought under the Alien Tort Statute. Other claims, in addition to torture and killing as provided for in the Torture Victim Protection Act, can still be recognized under the ATS as well. That issue, however, does not concern us in this case. We also think that the court in *Flores v. Southern Peru Copper Corp.*, 343 F.3d 140 (2nd Cir. 2003), was cognizant that the relationship between the statutes was murky. In discussing what the Tort Victim Protection Act was intended to accomplish, the court said:

> (N)either Congress nor the Supreme Court has definitively resolved the complex and controversial questions regarding the meaning and scope of the ATCA.

It is true that, in affirming the district court's dismissal of all claims in the case, the court in *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161 (5th Cir. 1999), discussed separately claims under the ATS and the Torture Victim Protection Act. There was, however, no need for the court to reach difficult questions such as

(continued...)

did not, it would be meaningless. No one would plead a cause of action under the Act and subject himself to its requirements if he could simply plead under international law. While there is no explicit statement to this effect in *Sosa*, the implications are that the cause of action Congress provided in the Torture Victim Protection Act is the one which plaintiffs alleging torture or extrajudicial killing must plead. As we said, the Court found that Act an "unambiguous" basis for such claims. The Court went on to say that the affirmative authority is confined to its specific subject matter, and that the legislative history says that § 1350 should "remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law," but the Court said Congress had done nothing to promote other such suits. *Id.* The Court emphasizes that "great caution" must be taken to adapt the laws of nations to private rights. It requires "vigilant doorkeeping." The Court was concerned with "collateral consequences" of making international rules privately actionable:

> [T]he subject of those collateral consequences is itself a reason for a high bar to new private causes of action for violating international law, for the potential implications for the foreign relations of the United States of recognizing such causes should make court particularly

---

[2] (...continued)

the relationship between the two statutes when the plaintiff's complaint failed entirely. Further, that the ATCA confers a private right of action is not contested in the case before us (as it was in *Abebe-Jira v. Negewo*, 72 F.3d 844 (11th Cir. 1996)), nor is the fact that one interpretation of the Torture Victim Protection Act is that it codified existing law, especially as set out in *Filartiga v.Pena-Irala*, 630 F.2d 876 (2nd Cir. 1980). In short, we think that the law on the issue before us is far from settled in the courts of appeals, but that the Supreme Court in *Sosa* offers us the best guidance as to what the relationship between these two statutes should be.

> wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs. . . . Since many attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences, they should be undertaken, if at all, with great caution.

*Id.* It is hard to imagine that the *Sosa* Court would approve of common law claims based on torture and extrajudicial killing when Congress has specifically provided a cause of action for those violations and has set out how those claims must proceed. As relevant to this case, then, the ATS would provide jurisdiction over a suit against General Abubakar for violations of the Torture Victim Protection Act.

But, as we mentioned, one procedural requirement in the Act is exhaustion. Section 2(b) says:

> A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.

It may be that a requirement for exhaustion is itself a basic principle of international law. In *Sosa*, the European Commission filed a brief as *amicus curiae* arguing that "basic principles of international law require that before asserting a claim in a foreign forum, the claimant must have exhausted any remedies available in the domestic legal system, and perhaps in other fora such as international claims tribunals." *Sosa* at 2766 n.21. The Court commented that it "would certainly consider this requirement in an appropriate case" and notes that the Torture Victim Protection Act has such a requirement. *Id.*

The plaintiffs before us have not pled under the Torture Victim Protection Act, and nothing in the record indicates that they have exhausted their remedies. We will remand this case to the district court for a determination regarding whether the plaintiffs should be allowed to amend their complaint to state such a claim and, if they do, whether, in

fact, the exhaustion requirement in the Torture Victim Protection Act defeats their claim. We therefore AFFIRM the decision of the district court concluding that General Abubakar is not immune from suit under the FSIA and REMAND the case to the district court for proceedings consistent with this opinion. Each side shall bear their own costs.

CUDAHY, *Circuit Judge*, dissenting in part. The majority remands this case because, though General Abubakar may not claim sovereign immunity for alleged human rights abuses, "[t]he plaintiffs before us have not pled under the Torture Victim Protection Act and nothing in the record indicates that they have exhausted their remedies." Maj. Op. at 16. While I agree that the defendant General Abubakar ultimately cannot claim sovereign immunity for the acts of torture and extrajudicial killing alleged in this case, I cannot agree that plaintiffs' suit is precluded by their failure to bring a claim under the Torture Victim Protection Act of 1991 (TVPA) or by their failure to exhaust legal remedies in Nigeria.

### The Relationship Between the ATCA and the TVPA

The majority's opinion raises an important legal question: whether the TVPA, 28 U.S.C. § 1350, note, P.L. 102-256, effectively restricts or precludes an alien's ability to bring claims for torture or extrajudicial killing under the Alien

Tort Claims Act (ATCA), 28 U.S.C. § 1350.[1] A host of factors strongly indicate that it does not.

First, both the plain text and the legislative history of the TVPA indicate that it was meant to expand, not restrict, the remedies available under the ATCA. The text of the TVPA itself contains no implicit or explicit repeal of the ATCA, nor does it indicate a Congressional intent to limit or supercede the ATCA in any way. It is a long-standing canon of statutory construction that repeals by implication are disfavored: "Where there are two acts upon the same subject, effect should be given to both if possible . . . . the intention of the legislature to repeal must be clear and manifest; otherwise, at least as a general thing, the later act is to be construed as a continuation of, and not a substitute for, the first act." *Posadas v. Nat'l City Bank of New York*, 296 U.S. 497, 503 (1936);[2] *see also Branch v. Smith*, 538 U.S. 254, 273 (2003) ("absent a clearly expressed congressional intention . . . repeals by implication are not favored") (internal quotations omitted); *Morton v. Mancari*, 417 U.S. 535, 551 (1974) (same rule). Additionally, as the majority notes, the TVPA itself was codified as part of the Historical

---

[1] This provision has also been referred to as the "Alien Tort Act," *see*, *e.g.*, *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995), and the "Alien Tort Statute," *see*, *e.g.*, *Filartiga v. Pena-Irala*, 630 F.2d 876, 880 (2d Cir. 1980).

[2] The Court elaborates on this principle as follows: "There are two well-settled categories of repeals by implication: (1) Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act. But, in either case, the intention of the legislature to repeal must be clear and manifest; otherwise, at least as a general thing, the later act is to be construed as a continuation of, and not a substitute for, the first act and will continue to speak, so far as the two acts are the same, from the time of the first enactment." *Posadas*, 296 U.S. at 503.

and Statutory Notes of the ATCA. *See* Maj. Op. at 12 n.1. This also suggests that the TVPA was meant to augment or elaborate the ATCA, not replace it.

But even assuming this constructional question cannot be resolved by text and canon alone, the legislative history of the TVPA leaves no doubt about the matter. By its terms the ATCA provides jurisdiction over tort suits *brought by aliens only*. After *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), and its progeny made ATCA human rights suits a familiar feature of the federal judicial landscape, Congress enacted the TVPA in 1991 specifically to provide a cause of action *for American nationals* subject to torture or extrajudicial killing in foreign countries. In so doing, Congress cited with approval the *Filartiga* line of cases and stated its intent to augment and expand the ATCA by providing a new cause of action accessible to American victims of brutality abroad. *See* S. Rep. No. 102-249, at 4-5 (1991); H.R. Rep. No. 102-367(I), at 3-4 (1991). In short, Congress did not seek to displace or circumscribe the ATCA, but rather to augment and expand its reach[3]. Congressional Reports on the TVPA state that

> The TVPA would establish an unambiguous and modern basis for a cause of action that has been successfully maintained under an existing law, section 1350 of the Judiciary Act of 1789 (the Alien Tort Claims Act), which permits Federal district courts to hear claims by aliens for torts committed "in violation of the law of nations." (28 U.S.C. sec. 1350). Section 1350 has other important

_____

[3] As at least one court of appeals has also noted, whereas the ATCA speaks only in terms of the *jurisdiction* of U.S. courts to hear alien tort claims, the TVPA went one step further to create *liability* for acts of torture and extrajudicial killing under U.S. law. *See Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 104-05 (2d Cir. 2000).

uses and should not be replaced. There should also, however, be a clear and specific remedy, not limited to aliens, for torture and extrajudicial killing.

H.R. Rep. No. 102-367(I), at 3 (emphasis added). Turning to the ATCA's ambiguity regarding a cause of action for human rights claims,[4] the House Report continued:

The TVPA would provide such a grant [of an express cause of action], and would also enhance the remedy already available under section 1350 in an important respect: While the Alien Tort Claims Act provides a remedy to aliens only, the TVPA would extend a civil remedy also to U.S. citizens who may have been tortured abroad. Official torture and summary executions merit special attention in a statute expressly addressed to those practices. At the same time, claims based on torture or summary executions do not exhaust the list of actions that may appropriately be covered [by] section 1350. That statute should remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law.

H.R. Rep No. 102-376(I), at 4. The Senate Report on the TVPA casts the Act in the same light, using virtually identical language. *See* S. Rep. No. 102-249, at 5.[5] The major

---

[4] On this score the Report is responding in particular to the concerns raised by Judge Bork in his concurring opinion in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984). The Report cites Judge Bork's opinion specifically. *See* H.R. Rep. No. 102-367(I), at 4.

[5] Addressing these same issues, the Senate Report states:

The TVPA would establish an unambiguous basis for a cause of action that has been successfully maintained under an existing law, section 1350 of title 28 of the U.S. Code, derived from the Judiciary Act of 1789 (the Alien Tort Claims Act).

(continued...)

ity's contention that the TVPA would be "meaningless" if it did not preempt the ATCA is therefore incorrect—the TVPA still serves its purpose of filling a gap in the ATCA's coverage by providing a cause of action for American citizens for certain human rights violations. In this respect the TVPA does not even purport to "occupy the entire field" (as the majority claims) and, as Congress itself made clear, the ATCA was to remain intact to function as before.

The two acts thus are not competing provisions but are meant to be complementary and mutually reinforcing (if somewhat coextensive). Federal courts addressing this specific issue have ruled accordingly, holding that the TVPA does not restrict the scope and coverage of the ATCA. *See*, *e.g.*, *Kadic v. Karadzic*, 70 F.3d 232, 241 (2d Cir. 1995) ("The scope of Alien Tort Act remains undiminished by enactment of the Torture Victim Act"); *Flores v. S. Peru Copper Corp.*, 343 F.3d 140, 153 (2d Cir. 2003) (recognizing that "the TVPA reaches conduct that may also be covered by the ATCA"); *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 168-69 (5th Cir. 1999) (considering separately claims under the ATCA and TVPA that are "essentially predicated

---

[5]  (...continued)

. . . .

The TVPA would provide such a grant [of a cause of action], and would also enhance the remedy already available under section 1350 in an important respect: while the Alien Tort Claims Act provides a remedy to aliens only, the TVPA would extend a civil remedy also to U.S. citizens who may have been tortured abroad. Official torture and summary executions merit special attention in a statute expressly addressed to those practices. At the same time, claims based on torture or summary executions do not exhaust the list of actions that may appropriately be covered by section 1350. Consequently, that statute should remain intact.

S. Rep. No. 102-249 at 4-5 (footnote omitted).

on the same claims of individual human rights abuses"); *Abebe-Jira v. Negewo*, 72 F.3d 844, 848 (11th Cir. 1996) (citing the TVPA as confirmation that the ATCA itself confers a private right of action); *Hilao v. Estate of Marcos*, 103 F.3d 767, 778-79 (9th Cir. 1996) (noting that the TVPA codifies the cause of action recognized to exist in the ATCA); *Wiwa v. Royal Dutch Petroleum Co. et al.*, 2002 WL 319887 at *4 (S.D.N.Y. Feb. 28, 2002) (concluding that "plaintiffs' claims under ATCA are not preempted by the TVPA . . . . the TVPA simply provides an additional basis for assertion of claims for torture and extrajudicial killing"); *Doe v. Islamic Salvation Front*, 993 F. Supp. 3, 7-9 (D.D.C. 1998) (recognizing simultaneous claims under the ATCA and the TVPA). Indeed to rule otherwise would implicitly undercut more than twenty years of jurisprudence, inaugurated by *Filartiga*, which affirms the ATCA's applicability to human rights suits. The majority has not identified any contrary precedents on this point, and I am not aware of any.

Of course, the Supreme Court addressed the scope of the ATCA quite recently in *Sosa v. Alvarez-Machain*, 124 S.Ct. 2739 (2004). The majority incredibly casts the *Sosa* decision as confirming the preclusive effect of the TVPA. *See* Maj. Op. at 14-15. Yet in fact the *Sosa* Court, while cautioning that the set of international norms supporting a cause of action for suits under the ATCA must be construed narrowly, stated that "a clear mandate" for such suits appears in the TVPA. *Id.* at 2763. Torture and extra-judicial killing were thus cited as paradigmatic examples of international norms that are sufficiently universal and definite to support claims under the ATCA. It would be decidedly odd—indeed it would be grossly misleading—if the Supreme Court, in making such a declaration, meant to remove these very causes of action from the ambit of the ATCA. The majority, in claiming *Sosa* as authority for the preclusive effect of the TVPA, stands *Sosa* on its head. That case in fact relies on the TVPA as evidence of Congressional acceptance of

torture as a norm *enforceable via the ATCA*. There is nothing, express or implied, in *Sosa* to suggest anything about preclusion.

In view of the text of the TVPA itself, the circumstances surrounding its passage, the canons of statutory interpretation discouraging repeals by implication, the legislative history of the Act and prevailing judicial rulings on the subject, it is clear that the TVPA was not intended to preempt or restrict aliens' ability to bring claims for torture and extrajudicial killing under the ATCA. Plaintiffs in the present case should be allowed to bring their claims for these abuses under the ATCA itself, without resorting to the TVPA.

### Exhaustion of Remedies:

This brings us to exhaustion of remedies. As the majority notes, the TVPA contains an exhaustion requirement—individuals suing under the TVPA must first exhaust available legal remedies in the place where the alleged misconduct occurred before bringing suit in U.S. court. 28 U.S.C. § 1350, note, § 2(b). Having given preemptive effect to the TVPA, the majority rules that plaintiffs' claims are procedurally barred since they have not demonstrated that they have exhausted their remedies. Maj. Op. at 16. This disposition is problematic for several reasons.

First, since the TVPA does not preclude or preempt actions brought under the ATCA and the common law for torture or extrajudicial killing, it follows that the specific exhaustion requirement of the TVPA does not apply to ATCA actions in the first place. But, to be sure, incorporating an implicit exhaustion requirement in the ATCA would have something to recommend it. Doing so would, among other things, bring the Act into harmony with both the provisions of the TVPA (with which it is at least partially coextensive) and with the acknowledged tenets of interna-

tional law.[6] And while not directly applicable to the ATCA, the TVPA scheme is surely persuasive since it demonstrates that Congress not only assumed that the exhaustion requirements imposed by customary international law were discernible and effective in themselves, but also that they should be reflected in U.S. domestic law.[7] Considerations of equity and consistency also recommend this approach since otherwise American victims of torture would be bound by an

---

[6] Exhaustion of remedies requirements are a well-established feature of international human rights law. *See, e.g.*, I. BROWNLIE, PRINCIPLES OF PUBLIC INTERNATIONAL LAW 472-81, 552 (6th ed. 2003); The American Convention on Human Rights, Nov. 22, 1969, 1144 U.N.T.S. 143, art. 46; The European Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, 213 U.N.T.S. 222, art. 26; The Velasquez Rodriguez Case, Inter-Am. C.H.R., July 29, 1988, at ¶¶50-73, *available via* http://www.oas.org. Certainly in applying a statute like the ATCA, where liability is predicated on "violation of the law of nations," it would seem natural to honor the basic tenets of public international law. It is also well-established that, as a general proposition, U.S. law should incorporate and comport with international law where appropriate. *See F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 124 S.Ct. 2359, 2366 (2004) (Courts must assume that Congress seeks to comply with customary international law); *The Paquete Habana*, 175 U.S. 677, 700 (1900) ("International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination."); *Murray v. Schooner Charming Betsy*, 2 Cranch 64, 118 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains").

[7] The TVPA's legislative history reveals that its exhaustion provisions are expressly modeled on those of customary international law, and it sets forth the parameters of the exhaustion analysis with striking clarity. *See* S. Rep. No. 102-249, at 9-10.

exhaustion requirement under the TVPA and foreign plaintiffs could avoid such strictures by pleading under the ATCA.

This question is far from settled, however, and the Supreme Court's decision in *Sosa*, though suggestive, offers little guidance. While it recognizes the possibility of reading an exhaustion requirement into the ATCA, the Court states only that it "would certainly consider this [exhaustion] requirement in an appropriate case." 124 S.Ct. at 2766, n. 21. Other federal courts appear to be less receptive to the idea.[8] In short, it is far from clear that, purely as a matter of United States jurisprudence, the ATCA contains any exhaustion requirement at all.

However, even assuming that an exhaustion requirement should be read into the ATCA, the majority has placed the evidentiary burden on the wrong party. Under both the TVPA and public international law, it is the *respondent or defendant's* burden to demonstrate that plaintiffs had

---

[8] Apparently no court of appeals has confronted the issue squarely, though the Second Circuit's decision in *Kadic v. Karadzic* at least implicitly did so by ostensibly declining to impose an exhaustion requirement on claims for torture and summary execution, even though it was also considering TVPA claims based on the same alleged abuses. 70 F.3d at 241-44. Several federal district courts have made more express rulings to this effect. See *Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112, 1157 (E.D. Cal. 2004) ("Plaintiffs asserting claims under the ATCA are not required to exhaust their remedies in the state in which the alleged violations of customary international law occurred."); *Sarei v. Rio Tinto PLC*, 221 F. Supp. 2d 1116, 1133 (C.D. Cal. 2002) ("The court is not persuaded that Congress' decision to include an exhaustion of remedies provision in the TVPA indicates that a parallel require-ment must be read into the ATCA.") (citing *Kadic*, 70 F.3d at 241); *Jama v. I.N.S.*, 22 F. Supp. 2d 353, 364 (D.N.J. 1998) ("There is nothing in the ATCA which limits its application to situations where there is no relief available under domestic law.").

adequate legal remedies which they did not pursue on the country where the alleged abuses occurred. *See* S. Rep. No. 102-249, at 10 ("respondent has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that domestic remedies exist that the claimant did not use.");[9] *accord Hilao*, 103 F.3d at 778 n.5 (quoting

---

[9] The Senate Report on the Torture Victim Protection Act is quite clear on both the specifics of the exhaustion of remedies analysis and its basis in international law:

Cases involving torture abroad which have been filed under the Alien Tort Claims Act show that torture victims bring suits in the United States against their alleged torturers only as a last resort. Usually, the alleged torturer has more substantial assets outside the United States and the jurisdictional nexus is easier to prove outside the United States. Therefore, as a general matter, the committee recognizes that in most instances the initiation of litigation under this legislation will be virtually prima facie evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred. The committee believes that courts should approach cases brought under the proposed legislation with this assumption.

More specifically, as this legislation involves international matters and judgments regarding the adequacy of procedures in foreign courts, the interpretation of section 2(b), like the other provisions of this act, should be informed by general principles of international law. The procedural practice of international human rights tribunals generally holds that the respondent has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that domestic remedies exist that the claimant did not use. Once the defendant makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously
(continued...)

S. Rep. No. 102-249, at 9-10); The Velasquez Rodriguez Case, Inter-Am. C.H.R., July 29, 1988, at ¶¶57-61, *available via* http://www.oas.org (citing The American Convention on Human Rights, Nov. 22, 1969, 1114 U.N.T.S. 143, art. 46). Then, *if* the defendant "makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile." S. Rep. No. 102-249 at 10; *accord* The Velasquez Rodriguez Case, Inter-Am. C.H.R., July 29, 1988, at ¶¶57-61, *available via* http://www.oas.org.

In the present case Abubakar has raised the non-exhaustion defense, but he appears not to have proven the existence of specific remedies that should have been pursued in Nigeria. On this basis alone Abubakar's exhaustion defense must fail. *See Hilao*, 103 F.3d at 778 n.5 (denying defense of exhaustion where defendant had not carried its evidentiary burden under this burden-shifting scheme); *accord* The Velasquez Rodriguez Case, Inter-Am. C.H.R., July 29, 1988, at ¶60, *available via* http://www.oas.org (state alleging non-

---

[9] (...continued)

futile. The ultimate burden of proof and persuasion on the issue of exhaustion of remedies, however, lies with the defendant.

This practice is generally consistent with common-law principles of exhaustion as applied by courts in the United States. See, e.g., *Honig v. Doe*, 484 U.S. 305, 325-29 (1988) (allowing plaintiffs to by-pass administrative process where exhaustion would be futile or inadequate).

. . . .

As in the international law context, courts in the United States do not require exhaustion in a foreign forum when foreign remedies are unobtainable, ineffective, inadequate, or obviously futile.

S. Rep. No. 102-249, at 9-10 (footnotes omitted).

exhaustion of remedies must "prove[ ] the existence of specific domestic remedies that should have been utilized").

But even if General Abubakar were deemed to have made the requisite showing that specific domestic legal remedies exist, plaintiffs' suit should still be allowed to proceed. Plaintiffs have introduced evidence that they or their relatives were targeted by the Nigerian government as political enemies, and under such circumstances there was obviously nothing to be gained by filing complaints in the Nigerian courts. The facts of life shed some doubt on the majority's airy conclusion that African courtrooms would provide a more hospitable forum for these claims than those of Chicago. U.S. government sources reveal that from the year 2000, when Abubakar relinquished power, until 2003, when plaintiffs filed the instant suit, the Nigerian judiciary was under-funded, corrupt, subject to political influence and generally unable or unwilling to compensate victims of past human rights abuses. *See* United States Department of State, Nigeria: Country Reports on Human Rights Practices—2003 (February 25, 2004), §§ 1(e), 4; United States Department of State, Nigeria: Country Reports on Human Rights Practices—2000 (February 23, 2001), at §§ 1(e), 4. There can be little doubt but that the legal remedies offered by the Nigerian courts were indeed ineffective, unobtainable, unduly prolonged, inadequate or obviously futile under any applicable exhaustion provisions.

Finally, to the extent that there is any doubt on this issue, both Congress and international tribunals have mandated that such doubts be resolved in favor of the plaintiffs. The Senate Report on the TVPA directs courts to *assume* that the exhaustion requirement has been met. Since "torture victims bring suits in the United States against their alleged torturers only as a last resort . . . . the initiation of litigation under this legislation will be *virtually prima facie evidence that the claimant has exhausted his or her remedies*

*in the jurisdiction in which the torture occurred.*" S. Rep. No. 102-249, at 9-10 (emphasis added). The Report explicitly states that "courts should approach cases brought under the proposed legislation with this assumption" and reminds us that "[t]he ultimate burden of proof and persuasion on the issue of exhaustion of remedies . . . lies with the *defendant.*" *Id.* at 10 (emphasis added); a*ccord* The Velasquez Rodriguez Case, Inter-Am. C.H.R., July 29, 1988, at ¶59, *available via* http://www.oas.org ("the State claiming non-exhaustion has an obligation to prove that domestic remedies remain to be exhausted and that they are effective") (quotation marks omitted).

### Immunity

Thus, even if an exhaustion requirement is read into the ATCA, the majority should have proceeded to the merits of the immunity issue rather than remand the case for consideration of pleading and exhaustion questions. As to the immunity issue itself, the district court concluded that the Foreign Sovereign Immunities Act (FSIA) does not apply to individuals, and the majority opinion appears to agree, holding that General Abubakar receives no protection from the Act. *See* Maj. Op. at 9; *cf. Ye v. Zemin*, 383 F.3d 620, 625 (7th Cir. 2004) ("The FSIA does not . . . address the immunity of foreign heads of states. The FSIA refers to foreign states, not their leaders.").

Of course, the majority of courts of appeals disagree, holding that the FSIA affords immunity to individual foreign officials for legally authorized acts taken in their official capacity. *See Velasco v. Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004) ("courts have construed foreign sovereign immunity to extend to an individual acting in his official capacity on behalf of a foreign state"); *Park v. Shin*, 313 F.3d 1138, 1144 (9th Cir. 2002) ("Individual government employees may be considered 'foreign states' within the

meaning of the FSIA."); *Keller v. Central Bank of Nigeria*, 277 F.3d 811, 815 (6th Cir. 2002) ("normally foreign sovereign immunity extends to individuals acting in their official capacities as officers of corporations considered foreign sovereigns."); *Byrd v. Corporacion Forestal Y Industrial De Olancho S.A.*, 182 F.3d 380, 388 (5th Cir. 1999) ("Normally, the FSIA extends to protect individuals acting within their official capacity as officers of corporations considered foreign sovereigns."); *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996) ("An individual can qualify as an 'agency or instrumentality of a foreign state'" when acting in his official capacity on behalf of the state.); *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1103 (9th Cir. 1990) (Concluding that the FSIA "can fairly be read to include individual sued in their official capacity.").

Affording immunity to foreign officials for legally author-ized acts may be more consonant with the tenets of current international law[10]—not to mention this country's own law on immunities for domestic officials[11]—yet under either approach the end result is the same since, even under the more liberal interpretation advanced by the majority of the circuits, officials receive no immunity for acts that violate international *jus cogens* human rights norms (which by

---

[10] *See Regina v. Bow Street Metropolitan Stipendiary Magistrate and Others*, Ex Parte Pinochet Ugarte (No. 3), [2000] 1 A.C. 147 (1999) (appeal taken from Q.B.) (ruling that a former head of state enjoys immunity for legally authorized acts taken in his official capacity, but not for acts, such as torture, committed in violation of *jus cogens* international norms); Case Concerning the Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belgium), I.C.J., February 14, 2002, at ¶61, *available at* http://www.icj-cij.org (confirming that national courts may try former foreign officials for acts committed in their private ca-pacities).

[11] *See, e.g., Monell v. Dept. of Soc. Svcs.*, 436 U.S. 658, 690 n.55 (1978).

definition are not legally authorized acts). *See, e.g., Chuidian*, 912 F.2d at 1106 ("Sovereign immunity . . . will not shield an official who acts beyond the scope of his authority."); *Hilao v. Estate of Marcos*, 25 F.3d 1467, 1472 (9th Cir. 1994) ("acts of torture, execution, and disappearance were clearly acts outside of his authority as President . . . . Marcos' acts were not taken within any official mandate and were therefore not the acts of an agency or instrumentality of a foreign state within the meaning of FSIA.") (citing *Chuidian*, 912 F.3d at 1106); *Trajano v. Marcos*, 978 F. 2d 493 (9th Cir. 1992) (same rule). General Abubakar is therefore not entitled to immunity in any event.[12]

---

[12] The foreign policy implications of the immunity question are intensified where a sitting or former foreign head of state is involved. Fortunately, the question of General Abubakar's immunity for acts taken as Nigeria's head of state is not before us—General Abubakar has appealed the district court's denial of immunity only for acts taken as a member of the Nigerian Provisional Ruling Council.

**Conclusion**

For the foregoing reasons, I would affirm the ruling of the district court and allow this case to proceed to a trial on the merits.


A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*