FISHER, Circuit Judge.
This appeal presents questions of justici-ability and exhaustion in the context of the Alien Tort Claims Act, 28 U.S.C. § 1350 (“ATCA”). Plaintiffs are current or for *1074 mer residents of Bougainville, Papua New Guinea (“PNG”), who allege that they or their family members were the victims of numerous violations of international law as a result of defendant mining corporation Rio Tinto, PLC’s (“Rio Tinto”) Bougain-ville mining operations and the 10-year civil conflict that followed an uprising at the Rio Tinto mine.[1] The plaintiffs appeal the district court’s dismissal of their lawsuit seeking redress under the ATCA, which provides that “[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.” 28 U.S.C. § 1350.
Although several different doctrines of justiciability are at issue here — the political question doctrine, the act of state doctrine and the doctrine of international comity — all in effect provide different ways of asking one central question: are United States courts the appropriate forum for resolving the plaintiffs’ claims? The answer to this question turns in part on the weight to be given to a statement of interest submitted by the United States Department of State (“State Department”) asserting that continuation of the lawsuit “would risk a potentially serious adverse impact ... on the conduct of [United States] foreign relations.” Rio Tinto’s cross-appeal also argues that the ATCA requires exhaustion of local remedies — yet another way of questioning whether there is a different and more appropriate forum to develop and try these claims.
We conclude that most of the plaintiffs’ claims may be tried in the United States. We hold that the district court erred in dismissing all of the plaintiffs’ claims as presenting nonjusticiable political questions, and in dismissing the plaintiffs’ racial discrimination claim under the act of state doctrine. We also vacate for reconsideration the district court’s dismissal of the plaintiffs’ United Nations Convention on the Law of the Sea (“UNCLOS”) claim under the act of state doctrine, and its dismissal of the racial discrimination and UNCLOS claims under the international comity doctrine. Although Rio Tinto and amicus curiae have asserted several plausible rationales in support of an exhaustion requirement, we affirm the district court’s conclusion that no such requirement presently exists, and leave it to Congress or the Supreme Court to alter the status quo if warranted.

I. BACKGROUND

Because this case arises from a dismissal under Federal Rule of Civil Procedure 12(b)(6), we accept all facts alleged in the plaintiffs’ complaint as true and construe them in the light most favorable to the plaintiffs. Transmission Agency v. Sierra Pac. Power Co., 295 F.3d 918, 923 (9th Cir.2002).
If plaintiffs’ allegations are believed, the defendant Rio Tinto, an international mining company, with the assistance of the PNG Government, committed various egregious violations of jus cogens norms and customary international law including racial discrimination, environmental devastation, war crimes and crimes against humanity, with severe repercussions for many citizens of PNG.[2]
*1075 A. The Bougainville Civil Uprising
Rio Tinto is an international mining group headquartered in London. During the 1960s, Rio Tinto sought to build a mine in the village of Panguna on Bougainville, an island province of PNG. Rio Tinto offered the PNG government 19.1 percent of the mine’s profits to obtain its assistance in this venture.
Operations commenced in 1972. Each day, approximately 300,000 tons of ore and waste rock were blasted, excavated and removed from the mine, producing 180,000 tons of copper concentrate and 400,000 ounces of gold annually. The resulting waste products from the mine polluted Bougainville’s waterways and atmosphere and undermined the physical and mental health of the island’s residents. In addition, the islanders who worked for Rio Tinto, all of whom were black, were paid lower wages than the white workers recruited off island and lived in “slave-like” conditions.
In November 1988, Bougainvilleans engaged in acts of sabotage that forced the mine to close. Rio Tinto sought the assistance of the PNG government to quell the uprising and reopen the mine. The PNG army mounted an attack on February 14, 1990, killing many civilians. In response, Bougainvilleans called for secession from PNG, and 10 years of civil war ensued.
During the 10-year struggle, PNG allegedly committed atrocious human rights abuses and war crimes at the behest of Rio Tinto, including a blockade, aerial bombardment of civilian targets, burning of villages, rape and pillage. Plaintiffs assert that the war has ravaged the island and devastated its inhabitants. Thousands of Bougainville’s residents have died; those who survived suffer health problems, are internally displaced and live in care centers or refugee camps or have fled the island.
The plaintiffs filed suit in federal district court seeking compensatory, punitive and exemplary damages, as well as equitable and injunctive relief on environmental contamination and medical monitoring claims, and attorney’s fees and costs. They also seek disgorgement of all profits earned from the mine.
B. The State Department’s Statement of Interest
After Rio Tinto moved to dismiss the first amended complaint, the district court, by letter dated August 30, 2001, sought guidance from the State Department “as to the effect, if any, that adjudication of this suit may have on the foreign policy of the United States.”
On November 5, 2001, the State Department filed a statement of interest (“SOI”). After noting that the district court had not asked the United States to comment on the act of state and political question doctrines, the State Department reported that “in our judgment, continued adjudication of the claims ... would risk a potentially serious adverse impact on the peace process, and hence on the conduct of our foreign relations,” and that PNG, a “friendly foreign state,” had “perceive[d] the potential impact of this litigation on U.S.-PNG relations, and wider regional interests, to be ‘very grave.’ ” Attached to the SOI was the PNG government’s communique stating that the case “has potentially very serious social, economic, legal, political and security implications for” PNG, including adverse effects on PNG’s *1076 international relations, “especially its relations with the United States.”
The plaintiffs responded by submitting as offers of proof declarations from peace agreement participants stating that the agreement would not be affected by the litigation, and in fact would be strengthened. The plaintiffs later asked the State Department to “clarify” its submission to the court. The State Department on May 20, 2002 informed the district court that it “did not intend to file another statement of interest” in response.
C. The District Court’s Dismissal
The district court dismissed the first amended complaint in a comprehensive and thoughtful ruling on March 20, 2002. It issued an amended opinion on July 9, 2002. Sarei v. Rio Tinto, PLC, 221 F.Supp.2d 1116 (C.D.Cal.2002). The court found that the plaintiffs had stated cognizable ATCA claims for racial discrimination, crimes against humanity and violations of the laws of war, but that of the environmental claims, only the violation of the United Nations Convention on the Law of the Sea (“UNCLOS”) was cognizable under the ATCA. Id. at 1139-1163. The court further held that if proven, the allegations supported liability against Rio Tin-to for certain acts committed by the PNG government. Id. at 1148-49. The court, however, dismissed all of the plaintiffs’ claims as presenting nonjusticiable political questions. Id. at 1193-1199. The court alternatively dismissed the racial discrimination and UNCLOS claims under the act of state doctrine and the doctrine of international comity. Id. at 1183-1193 (act of state); 1199-1209 (international comity). It also held that the ATCA did not require exhaustion. Id. at 1132-1139.
Prior to the dismissal, the plaintiffs sought leave to file an amended complaint. The district court denied their motion in the same judgment dismissing the complaint, finding that any such amendment would be futile.
D. Purported Change in the PNG Government’s Position on the Litigation Since the District Court’s Decision
The plaintiffs have asked that we take judicial notice of evidence suggesting that the PNG government no longer opposes the pursuit of this litigation because of a change in administration. In support of this claim, they offer:
1) A statement made on the parliament floor by Sir Michael Somare, the Prime Minister of PNG, that “[i]n my view ... this is a litigation that has nothing to do with the United States Government or any investors.... Let the case proceed.”
2) A letter dated February 6, 2003 from Joshua Kalinoe, Chief Secretary to the PNG Government, stating that”[w]hilst the complainants [in this case] are exercising their rights as citizens of [PNG], the Government does not support nor deny the constitutional rights of the citizens from taking whatever action they deem necessary.”
3) A second letter from Kalinoe, dated March 30, 2005, reaffirming the position taken in his 2003 letter, stating, “The government is not a party to this case. Accordingly, it does not see the case presently before the courts affecting diplomatic and bilateral relations between our two countries nor does it see it affecting the peace process on the island of Bougainville.”
4) A letter to the State Department dated January 8, 2005 from John Momis, the Interim Bougainville Provincial Governor, “urg[ing] the Government of the United States to support the Prime Min *1077 ister’s position to permit the case to proceed in the courts of America.”

II. DISCUSSION

A. Subject Matter Jurisdiction
The district court held that the plaintiffs had properly alleged claims under the ATCA against Rio Tinto for violations of the laws of war, for crimes against humanity, for racial discrimination and for violations of the United Nations Convention on the Law of the Sea, and that Rio Tinto could be held hable for some actions of the PNG military. The district court also held that plaintiffs had failed to state ATCA claims for violations of the “right to life and health” and for environmental harm under the principle of “sustainable development.” Neither party has expressly appealed these holdings, although Rio Tinto has noted its disagreement with the district court’s failure to dismiss all claims on subject matter jurisdiction grounds.
Lack of subject matter jurisdiction is not waived by failure to object and may be raised at any time in the proceedings. See, e.g., United States v. Ceja-Prado, 333 F.3d 1046, 1049 (9th Cir.2003). Further, it is our responsibility as a court of limited jurisdiction to ensure that we have subject matter jurisdiction before proceeding further. Allstate Ins. Co. v. Hughes, 358 F.3d 1089, 1093 (9th Cir.2004).[3]
We withdrew submission in this appeal to wait for the Supreme Court’s opinion in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), which we anticipated would clarify whether the plaintiffs’ claims were cognizable under the ATCA. See Order Filed Dec. 10, 2003. In Rosa, the Supreme Court held that “courts should require any [ATCA] claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigm[ ]” causes of action for “offenses against ambassadors, violations of safe conduct ... [and] piracy.” Id. at 725, 720, 124 S.Ct. 2739 (internal citations omitted).[4] In doing so, it ratified the view of ATCA jurisdiction derived by the district court from Ninth Circuit precedent and applied in this case: “In evaluating plaintiffs’ ATCA claims, therefore, the court must consider ... whether they identify a specific, universal and obligatory norm of international law.” Sarei, 221 F.Supp.2d at 1132. See also In re Estate of Ferdinand Marcos, Human Rights Litig., 25 F.3d 1467, 1475 (9th Cir.1994) (stating that the ATCA “creates a cause of action for violations of specific, universal and obligatory international human rights standards which confer fundamental rights upon all people vis-a-vis their own governments.”) (internal citations and quotations omitted). The settled principles of law that governed the district court’s analysis therefore remain sound post-Rosa. See Sosa, 542 U.S. at 748, 124 S.Ct. 2739 (Sealia, J., concurring in part, concurring in the judgment *1078 and dissenting in part) (“[T]he verbal formula ... applied [by the Ninth Circuit to determine whether ATCA jurisdiction lies] is the same verbal formula that the Court explicitly endorses.”).
We further agree with the district court’s conclusion that the plaintiffs’ claims for war crimes, violations of the laws of war, racial discrimination and for violations of the UNCLOS all implicate “specific, universal and obligatory norm[s] of international law” that properly form the basis for ATCA claims, Sarei, 221 F.Supp.2d at 1132, and that Sosa’s gloss on this standard does not undermine the district court’s reasoning. All of the plaintiffs’ remaining claims, with the exception of the UNCLOS claim, assert jus cogens violations that form the least controversial core of modern day ATCA jurisdiction. See, e.g., Sosa, 542 U.S. at 729-30, 124 S.Ct. 2739 (endorsing approach of courts applying the ATCA to settled violations of the law of nations); Kadic v. Karadzic, 70 F.3d 232, 243 (2d Cir.1995) (“The District Court has jurisdiction pursuant to the Alien Tort Act over appellants’ claims of war crimes and other violations of international humanitarian law.”).
As for the UNCLOS claim, the treaty has been ratified by at least 149 nations, which is sufficient for it to codify customary international law that can provide the basis of an ATCA claim. See United States v. Alaska, 503 U.S. 569, 588 n. 10, 112 S.Ct. 1606, 118 L.Ed.2d 222 (“The United States ... has recognized that [the UNCLOS’s] baseline provisions reflect customary international law.”); Lori F. Damrosch et al., International Law: Cases and Materials (4th ed.2001) at 1386 (most provisions of the UNCLOS “are clearly established customary law of the sea”).
Another potential jurisdictional complication is the plaintiffs’ efforts to hold Rio Tinto liable under theories of vicarious liability for alleged war crimes and crimes against humanity committed at its behest by the PNG army. A predicate question is whether, post-Sosa, claims for vicarious liability for violations of jus co-gens norms are actionable under the ATCA. We conclude that they are. Courts applying the ATCA draw on federal common law, and there are well-settled theories of vicarious liability under federal common law. See, e.g., Moriarty v. Glueckert Funeral Home, Ltd., 155 F.3d 859, 866 n. 15 (7th Cir.1998) (deriving federal common law agency liability principles from the Restatement of Agency).[5]
The second question is whether the plaintiffs have sufficiently alleged Rio Tin-to’s liability for the PNG military’s alleged war crimes. We agree with the district court that they have. The plaintiffs allege, for example, that “Rio Tinto knew that its wishes were taken as commands by the PNG government and Rio intended that its comments would spur the PNG forces into action,” that “Rio ... understood that ... [i]f Rio did not direct and/or encourage a military response ... none would have been initiated,” and similar allegations that Rio Tinto officials exercised control over the behavior of PNG forces with regard to *1079 the conflict around the mine. 221 F.Supp.2d at 1148. Based on these allegations, the district court concluded that “plaintiffs have adequately alleged that PNG’s actions are ‘fairly attributable’ to Rio Tinto,” and that “Rio Tinto ‘controlled’ [PNG’s] actions....” Sarei, 221 F.Supp.2d at 1148. Taking the allegations of Rio Tinto’s control over PNG forces as true, we agree with the district court that the plaintiffs have adequately alleged vicarious liability under the ATCA. Based on the plaintiffs’ uncontested (for our purposes) allegations, we are satisfied that we have jurisdiction to proceed.[6]
B. The Political Question Doctrine
The district court dismissed all of the plaintiffs’ claims on the ground that they presented nonjusticiable political questions. We have recently observed that this inquiry “proceeds from the age-old observation of Chief Justice Marshall that ‘questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.’ ” Alperin v. Vatican Bank, 410 F.3d 532, 544 (9th Cir.2005) (quoting Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 170, 2 L.Ed. 60 (1803)).
Courts considering the political question doctrine begin with the Supreme Court’s elaboration of the appropriate analysis in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), where the Court described the doctrine as a function of the separation of powers, and set forth six factors that require the dismissal of a suit under the political question doctrine if any one of them is “inextricable from the case at bar.” 369 U.S. at 217, 82 S.Ct. 691. Four are at issue here:
1. “a textually demonstrable constitutional commitment of the issue to a coordinate political department”;
* * *
4. “the impossibility of a court’s undertaking independent resolution without expressing lack of the respect due coordinate branches of government”;
5. “an unusual need for unquestioning adherence to a political decision already made”; or
6. “the potentiality of embarrassment from multifarious pronouncements by various departments on one question.”
Id.[7] In the context of foreign relations, “[n]ot only does resolution of such issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the Government’s views.” Id. at 211, 82 S.Ct. 691.
The district court dismissed all of the plaintiffs’ claims because it concluded that the fourth and sixth Baker factors were present. Sarei, 221 F.Supp.2d at 1197-98. Rio Tinto asserts that the first and fifth Baker factors are also present; the plaintiffs claim that none are present. We will address each in turn.
1. Factor One: Constitutional Commitment to Another Branch
In Alvarez-Machain v. United States, 331 F.3d 604 (9th Cir.2003), rev’d on other grounds, Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 *1080 L.Ed.2d 718 (2004), we adopted the Second Circuit’s holding that the resolution of claims brought under the ATCA has been constitutionally entrusted to the judiciary. Alvarez-Machain, 331 F.3d at 615 n. 7 (citing and quoting Kadic, 70 F.3d at 249 (“The department to whom this [tort suit] has been constitutionally committed is none other than our own — the Judiciary.”)); see also Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 48 (2d Cir.1991) (same); Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 797 (D.C.Cir.1984) (Edwards, J., concurring) (“[I]n implementing section 1350, courts merely carry out the existing view of the legislature that federal courts should entertain certain actions that implicate the law of nations.”); Restatement (Third) of the Foreign Relations Law of the United States § 111(2) (1987)[here-inafter Foreign Relations Law Restatement] (cases arising under international law are within the judicial power of the United States).
When the Supreme Court reversed our en banc decision in Sosa, it did not question our conclusion that ATCA suits are constitutionally entrusted to the judiciary; it simply determined that the specific claim at issue was not cognizable under the ATCA. To the extent that Rio Tinto seeks to argue that the first Baker factor is satisfied as to all ATCA claims, or relies on a logic that itself derives from such a view, the argument fails. Given that plaintiffs have properly alleged cognizable ATCA claims, it is not tenable to insist that the claims themselves are not entrusted to the judiciary.
2. Factors Four, Five and Six: Interference With A Coordinate Branch
The fourth, fifth and sixth Baker factors are relevant in an ATCA case “if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests.” Kadic, 70 F.3d at 249. To determine whether these factors are present, we must first decide how much weight to give the State Department’s statement of interest, which provided the basis for the district court’s determination that the fourth and six factors were present.

a. Treatment ofSOIs by Other Courts

The Second Circuit has stated that “an assertion of the political question doctrine by the Executive Branch, entitled to respectful consideration, would not necessarily preclude adjudication.” Kadic, 70 F.3d at 250.[8] As for exactly how much *1081 weight to give such statements, two Second Circuit cases suggest that the executive statements should be reviewed for “arbitrariness.” In National Petrochemical Co. of Iran v. M/T Stolt Sheaf, 860 F.2d 551, 555 (2d Cir.1988), the court found there was “no indication that[the SOI] is an arbitrary or ad hoc directive.” Following Petrochemical, the court in Matimak Trading Co. v. Khalily, 118 F.3d 76 (2d Cir.1997), abrogated on other grounds by J.P. Morgan Chase Bank v. Traffic Stream, 536 U.S. 88, 122 S.Ct. 2054, 153 L.Ed.2d 95 (2002), recognized that an “unexplained change in stance ... might under different circumstances require further inquiry of its ulterior motives,” but that “no reason is apparent ... for refusing to defer to the State Department in this case.” 118 F.3d at 82 (citing Petrochemical for proposition that “court might boggle at ‘ad hoc, pro hac vice’ directive of the government”).
More recently, in Ungaro-Benages v. Dresdner Bank AG, the Eleventh Circuit found an ATCA suit justiciable despite a SOI from the government disapproving of the suit, and noted, “This statement of interest from the executive is entitled to deference.... A statement of nation interest alone, however, does not take the present litigation outside of the competence of the judiciary.” 379 F.3d 1227, 1236 (11th Cir.2004).[9] And we recently stated that if “the State Department express[es] a view [on whether a case presents a political question,] that fact would certainly weigh” in the court’s determination. Vatican Bank, 410 F.3d at 556.
The Supreme Court in Sosa stated that “there is a strong argument that federal courts should give serious weight to the Executive Branch’s view of the case’s impact on foreign policy,” Sosa, 542 U.S. at 733 n. 21, 124 S.Ct. 2739, and prior to Sosa, some courts found a nonjusticiable political question where the State Department had indicated that a judicial decision would impinge upon important foreign policy interests. See, e.g., 767 Third Ave. Assocs. v. Consulate General (Yugo.), 218 F.3d 152, 160-61 (2d Cir.2000); Occidental of Umm Al Qaywayn, Inc. v. Certain Cargo of Petroleum, 577 F.2d 1196, 1204 (5th Cir.1978); see also In re Nazi Era Cases Against German Defs. Litig., 129 F.Supp.2d 370, 380-83 (D.N.J.2001); Burger-Fischer v. Degussa AG, 65 F.Supp.2d 248, 281-85 (D.N.J.1999).
Guided by separation of powers principles, as well as the cases discussed above, we conclude that although we will give the view in the SOI “serious weight,” Sosa, 542 U.S. at 733 n. 21, 124 S.Ct. 2739, it is not controlling on our determination of whether the fourth through sixth Baker factors are present. Ultimately, it is our responsibility to determine whether a political question is present, rather than to dismiss on that ground simply because the Executive Branch expresses some hesitancy about a case proceeding.

b. The 2001 State Department SOI in this Case

Although it is a close question, we conclude that the SOI submitted in this case, even when given serious weight, does not establish that any of the final three Baker factors is “inextricable from the case,” Baker, 369 U.S. at 217, 82 S.Ct. 691.
The SOI begins by noting that the State Department has not been “invited” to comment on the applicability of the political *1082 question doctrine itself. It next states that “[i]n our judgment, continued adjudication of the claims ... would risk a potentially serious adverse impact on the peace process, and hence on the conduct of our foreign relations.”[10] The SOI concludes with the observation that “[t]he Government of Papua New Guinea ... has stated its objection to these proceedings in the strongest terms,” and that PNG “perceives the potential impact of this litigation on U.S.-PNG relations, and wider regional interests, to be ‘very grave.’ ”
We first observe that without the SOI, there would be little reason to dismiss this case on political question grounds, and therefore that the SOI must carry the primary burden of establishing a political question. There is no independent reason why the claims presented to us raise any warning flags as infringing on the prerogatives of our Executive Branch. As such, these claims can be distinguished from cases in which the claims by their very nature present political questions requiring dismissal. See, e.g., Vatican Bank, 410 F.3d at 562 (identifying nonjusticiable political question presented by claims regarding alleged war crimes of an enemy of the United States committed during World War II). The Supreme Court has been clear' that “it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance,” and that the doctrine “is one of ‘political questions,’ not of ‘political cases’.” Baker, 369 U.S. at 211, 217, 82 S.Ct. 691. Without the SOI, this case presents claims that relate to a foreign conflict in which the United States had little involvement (so far as the record demonstrates), and therefore that merely “touch[] foreign relations.” Id. at 211, 82 S.Ct. 691.[11]
When we take the SOI into consideration and give it “serious weight,” we still conclude that a political question is not presented. Even if the continued adjudication of this case does present some risk to the Bougainville peace process, that is not sufficient to implicate the final three Baker factors, which require “the impossibility of a court’s undertaking independent resolution without expressing lack of the respect due coordinate branches of government,” “an unusual need for unquestioning adherence to a political decision already made” or “the potentiality of embarrassment from multifarious pronouncements by various departments on one question.” Baker, 369 U.S. at 217, 82 S.Ct. 691. The State Department explicitly did not request that we dismiss this suit on political question grounds, and we are confident that proceeding does not express any disrespect for the executive, even if it would prefer that the suit disappear.[12] Nor do we see any “unusual need for unquestioning adherence” to the SOI’s nonspecific invocations of risks to the peace process. And finally, given the guarded nature of the SOI, we see no “embarrassment” that would follow from fulfilling our independent duty to determine whether the case should proceed. We are mindful of Sosa’s instruction to give “serious weight” to the views of the executive, but we cannot up *1083 hold the dismissal of this lawsuit solely on the basis of the SOI.[13]
Our holding today is consistent with our recent dismissal of ATCA war crimes claims in Vatican Bank as presenting non-justiciable political questions. There, a proposed class of Holocaust survivors sued the Vatican Bank (a financial institution connected to the Vatican) for its complicity in various war crimes of the Nazi-sympathizing Ustasha puppet regime in Croatia, including Vatican Bank’s profiting from the Ustasha regime’s theft of the class’s property. 410 F.3d at 538. We concluded that “the claims for conversion, unjust enrichment, restitution, and an accounting with respect to lost and looted property are not committed to the political branches,” whereas “the broad allegations tied to the Vatican Bank’s alleged assistance to the war objectives of the Ustasha, including the slave labor claims, which essentially call on us to make a retroactive political judgment as to the conduct of the war ... are, by nature, political questions.” Id. at 548. We distinguished Kadic, another war crimes case, in which the Second Circuit had declined to find a political question: “[T]he claims in Kadic focused on the acts of a single individual during a localized conflict rather than asking the court to undertake the complex calculus of assigning fault for actions taken by a foreign regime during the morass of a world war.” Id. at 562.[14]
*1084 We do not understand Vatican Bank as foreclosing the plaintiffs’ claims that relate to the PNG regime’s alleged war crimes, but instead read its holding to apply only to the narrower category of war crimes committed by enemies of the United States. Considering such claims would necessarily require us to review the acts of an enemy of the United States, which would risk creating a conflict with the steps the United States actually chose to take in prosecuting that war. See id. at 560 (expressing unwillingness to “intrude unduly on certain policy choices and value judgments that are constitutionally committed to the political branches ... for we do not and cannot know why the Allies made the policy choice not to prosecute the Ustasha and the Vatican Bank.”) (internal citations and quotation marks omitted).
Reading Vatican Bank to preclude any ATCA war crimes claims would work a major, and inadvisable, shift in our ATCA jurisprudence. It would create a clear circuit split with Kadic. And it would contradict Sosa, which confirmed the view of the ATCA contained in Kadic and other cases when it stated that “[f]or two centuries we have affirmed that the domestic law of the United States recognizes the law of nations. It would take some explaining to say now that federal courts must avert their gaze entirely from any international norm intended to protect individuals.” Sosa, 542 U.S. at 729-30, 124 S.Ct. 2739 (internal citations omitted).
We hold that none of the plaintiffs’ claims present nonjusticiable political questions. The district court’s dismissal on that ground must be reversed.
C. The Act of State Doctrine
The act of state doctrine prevents U.S. courts from inquiring into the validity of the public acts of a recognized sovereign power committed within its own territory. See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); Timberlane Lumber Co. v. Bank of America, 549 F.2d 597, 605-607 (9th Cir.1977) (recounting history of doctrine). The doctrine reflects the concern that the judiciary, by questioning the validity of sovereign acts taken by foreign states, may interfere with the executive’s conduct of American foreign policy. W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., 493 U.S. 400, 404, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990). As a result, an action may be barred if (1) there is an “official act of a foreign sovereign performed within its own territory”; and (2) “the relief sought or the defense interposed [in the action would require] a court in the United States to declare invalid the[foreign sovereign’s] official act.” Id. at 405, 110 S.Ct. 701; see also Credit Suisse v. United States Dist. Court for Cent. Dist. of Cal., 130 F.3d 1342, 1346 (9th Cir.1997).
If these two elements are present, we may still choose not to apply the act of state doctrine where the policies underlying the doctrine militate against its application. The Supreme Court discussed three such policies in Sabbatino:
[ 1 ] [T]he greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it....
[ 2 ][T]he less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. [3] The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence.
Sabbatino, 376 U.S. at 428, 84 S.Ct. 923.
The district court dismissed the racial discrimination and UNCLOS claims under *1085 the act of state doctrine. Sarei, 221 F.Supp.2d at 1184-1193. The plaintiffs contend that the district court erred, whereas Rio Tinto argues that the district court should have dismissed the war crimes and violations of the laws of war claims as well.[15] The burden of proving acts of state rests on Rio Tinto. Liu v. Republic of China, 892 F.2d 1419, 1432 (9th Cir.1989) (citing Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 694-95, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); Republic of Philippines v. Marcos, 862 F.2d 1355, 1361 (9th Cir.1988) (en banc)).
The plaintiffs allege that PNG acted “at Rio’s direction” and that Rio Tinto and PNG “conspired to commit ... violations of customary international law.” As a result, certain acts of PNG are at issue, even if PNG is not a named defendant. See, e.g., National Coalition Gov’t of Burma v. Unocal, Inc., 176 F.R.D. 329, 352 (C.D.Cal.1997). We must therefore first determine whether these acts were “official.”
The district court reasoned that an official, noncommercial act of state was implicated in the racial discrimination and UNCLOS claims because
Rio Tinto conducted its mining activity pursuant to an agreement between its subsidiary, Bougainville Copper Limited, and the PNG Government.... Because PNG entered into the agreement, and codified it ... in order to exploit its natural resources, it is clear that it was engaged in a “public and governmental” as opposed to a “private and commercial” function.
Sarei, 221 F.Supp.2d at 1186 (citing cases).[16]
1. Racial Discrimination
We disagree with the district court’s conclusion that the alleged racial discrimination constituted an official act which the act of state doctrine could insulate from scrutiny. Acts of racial discrimination are violations of jus cogens norms. See Siderman de Blake, 965 F.2d at 717 (noting that the Foreign Relations Law Restatement “identifies] jus cogens norms prohibiting ... systematic racial discrimination”). The complaint alleges “systematic racial discrimination” and “policies of racial discrimination” in Rio Tinto’s operation of the mine, and that race was a motivating factor in several of the other alleged abuses. These allegations, which must be accepted as true at this stage, constitute jus cogens violations. Therefore, because “[[International law does not recognize an act that violates jus cogens as a sovereign act,” Siderman de Blake, 965 F.2d at 718, the alleged acts of racial discrimination cannot constitute official sovereign acts, and the district court erred in dismissing these claims under the act of state doctrine.
2. UNCLOS Violations
We agree with the district court that PNG’s actions taken pursuant to the Copper Act to exploit its own natural resources are “public acts of the sovereign.” See In re Estate of Marcos Human Rights Litig., 978 F.2d 493, 498 n. 10 (9th Cir.1992). Further, although the UNCLOS codifies norms of customary international law, see supra Section II.A, it is not yet clear whether “the international community recognizes the norm[s] as one[s] from *1086 which no derogation is permitted.” Siderman de Blake, 965 F.2d at 715 (internal quotations omitted). Without more, we cannot conclude that the UNCLOS norms are also jus cogens norms. Therefore, although the alleged UNCLOS violations represent violations of international law, the UNCLOS provisions at issue do not yet have a status that would prevent PNG’s acts from simultaneously constituting official sovereign acts. We further agree with the district court that to adjudicate the UNCLOS claim would require a court to judge the validity of these official acts.
Having found that the alleged UNCLOS violations constituted official sovereign acts, the district court turned to Sabbatino to determine whether the act of state doctrine barred any further consideration. See Sabbatino, 376 U.S. at 428, 84 S.Ct. 923. The district court’s application of the Sabbatino factors relied in part on the SOI’s assertion regarding the potential impact of this ease on United States foreign relations. See Sabbatino, 376 U.S. at 428, 84 S.Ct. 923 (identifying “implications ... for our foreign relations” as one factor to consider in act of state analysis).
Because we have rejected the district court’s reliance on the SOI in the context of the political question doctrine, we consider it prudent to allow the district court to revisit its reliance on the SOI in the act of state context. We have concluded that the SOI, even when given “serious weight,” does not establish — on its own— the presence of any of the Baker factors. However, the act of state analysis, while related, is not identical to the political question analysis. A consideration of foreign policy concerns is one of several Sabbatino factors, and the SOI’s foreign policy concerns are entitled to consideration, but only as one part of that analysis. Moreover, further factual development may be necessary to determine whether “the government which perpetrated the challenged act of state is [still] in existence.” Sabbatino, 376 U.S. at 428, 84 S.Ct. 923. We therefore vacate the district court’s UNC-LOS act of state dismissal for reconsideration in light of our analysis of the SOI.[17]
D. International Comity
Under the international comity doctrine, courts sometimes defer to the laws or interests of a foreign country and decline to exercise jurisdiction that is otherwise properly asserted. See, e.g., Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa, 482 U.S. 522, 544 n. 27, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987) (“Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states.”); In re Simon (Hong Kong & Shanghai Banking Corp. v. Simon), 153 F.3d 991, 998 (9th Cir.1998) (citing Hilton v. Guyot, 159 U.S. 113, 163-64, 16 S.Ct. 139, 40 L.Ed. 95 (1895)). See also Sosa, 542 U.S. at 761, 124 S.Ct. 2739 (Breyer, J., concurring) (stressing that it is important *1087 for courts to ask “whether the exercise of jurisdiction under the AT[CA] is consistent with those notions of comity that lead each nation to respect the sovereign rights of other nations by limiting the reach of its laws and their enforcement”).
“Declining to decide a question of law on the basis of international comity is a form of abstention, and we review a district court’s decision to abstain on international comity grounds for abuse of discretion.” JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 422 (2nd Cir.2005); see also Remington Rand Corporation-Delaware v. Business Systems, Inc., 830 F.2d 1260, 1266 (3d Cir.1987) (“Because the extension or denial of comity is discretionary, we review this issue by the abuse of discretion standard.”).[18] The district court dismissed the plaintiffs’ racial discrimination and UNC-LOS claims under the comity doctrine. Sarei, 221 F.Supp.2d at 1207. The plaintiffs contest this finding, whereas Rio Tin-to asserts that the district, court should have dismissed the war crimes and violations of the laws of war claims under this doctrine as well.[19]
As a threshold matter, the parties disagree as to whether the district court applied the appropriate comity analysis. The plaintiffs argue that this circuit has interpreted Supreme Court precedent to require a predicate inquiry into whether a true conflict of law exists. See In re Simon, 153 F.3d at 999 (citing Hartford Fire Ins. Co. v. California, 509 U.S. 764, 798, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993)) (limiting the application of the international comity doctrine to cases in which “there is in fact a true conflict between domestic and foreign law.”). Rio Tinto asserts that we consider a conflict of law as only one of several factors. The district court agreed with the plaintiffs, and assumed that a conflict was a predicate requirement. See Sarei, 221 F.Supp.2d at 1200-01. We agree with the district court, which followed Simon’s clear statement.[20]
The district court based its finding of a conflict on PNG’s Compensation (Prohibition of Foreign Proceedings) Act of 1995 (“Compensation Act”), which “prohibit[s] the taking or pursuing in foreign courts of legal proceedings in relation to compensation claims arising from mining projects and petroleum projects in Papua New Guinea.” Sarei, 221 F.Supp.2d at 1201.[21] The district court reasoned that a conflict existed because, “[w]hile the ATCA vests jurisdiction in federal courts to hear plaintiffs’ claims, the Compensation Act prohibits plaintiffs from filing the *1088 claims elsewhere than in PNG.” Id. at 1201. This conclusion was not an abuse of discretion.
Given a conflict of laws, courts then look to the nonexhaustive standards set forth in Foreign Relations Law Restatement § 403(2) (“Section 403(2)”):
Whether exercise of jurisdiction over a person or activity is unreasonable is determined by evaluating all relevant factors, including, where appropriate:
(a) the link of the activity to the territory of the regulating state, i.e., the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;
(b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;
(c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;
(d) the existence of justified expectations that might be protected or hurt by the regulation;
(e) the importance of the regulation to the international political, legal, or economic system;
(f) the extent to which the regulation is consistent with the traditions of the international system;
(g) the extent to which another state may have an interest in regulating the activity; and
(h)the likelihood of conflict with regulation by another state.
See also cmt. b (explaining that the list of considerations in Section 403(2) is not exhaustive and “[n]ot all considerations have the same importance in all situations; the weight to be given to any particular factor depends upon the circumstances”).
The district court concluded on the basis of the State Department’s SOI that it would best serve the United States’ interests to decline jurisdiction. See Sarei, 221 F.Supp.2d at 1205. In addition, it found that the first two Restatement factors weighed in favor of declining jurisdiction on the racial discrimination and environmental harm claims because (1) all the conduct complained of occurred in PNG; (2) all the plaintiffs but the lead plaintiff, Sarei, are PNG residents; and (3) Rio Tinto, although not a PNG resident, has conducted significant business in, and has strong ties to, PNG. Id. at 1206. Finally, it concluded that an additional factor counseled dismissing the environmental harms because such claims arise out of PNG’s exploitation of its natural resources. See id.
The district court acted within its discretion in determining that it should decline to hear these claims on comity grounds. However, as with the district court’s act of state dismissal of the UNCLOS claim, because we have rejected the district court’s reliance on the SOI in the context of the political question doctrine, we again consider it prudent to allow the district court to revisit its reliance on the SOI in the comity context. Further factual development may also be warranted to determine whether and how the Restatement factors apply to these claims. We therefore vacate the district court’s comity ruling for reconsideration in light of our analysis of *1089 the SOI.[22]
E. It Would Not Be Appropriate At this Time to Recognize an Exhaustion Requirement in the ATCA
The district court held that exhaustion of local remedies was not required under the ATCA. Sarei, 221 F.Supp.2d at 1139. It examined the text of the Torture Victims Protection Act of 1991 (“TVPA”), Pub.L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, historical and statutory notes), which expressly requires exhaustion, and determined that the TVPA’s requirement did not mandate a similar one for the ATCA. See Sarei, 221 F.Supp.2d at 1132-38. The court also rejected Rio Tinto’s contention that an exhaustion requirement should be read into the ATCA because such exhaustion is customary under international law. See id. at 1138-39. It concluded that the ATCA “is a creature of domestic law,” and that the plain language of the statute did not require exhaustion. Id. at 1139.
Rio Tinto’s cross-appeal urges that an exhaustion requirement should be read into the ATCA. Two international legal jurists, Sir Ninian M. Stephen and Judge Stephen M. Schwebel, have filed an ami-cus brief supporting Rio Tinto’s position.
The Supreme Court in Sosa hinted that it might be amenable to recognizing an exhaustion requirement as implicit in the ATCA:
This requirement of clear definition is not meant to be the only principle limiting the availability of relief in the federal courts for violations of customary international law, though it disposes of this case. For example, the European Commission argues as amicus curiae that basic principles of international law require that before asserting a claim in a foreign forum, the claimant must have exhausted any remedies available in the domestic legal system, and perhaps in other fora such as international claims tribunals. We would certainly consider this requirement in an appropriate case.
Sosa, 542 U.S. at 733 n. 21, 124 S.Ct. 2739 (internal citations omitted).
Neither the Supreme Court nor any circuit court, however, has resolved the issue of whether the ATCA requires exhaustion of local remedies. This circuit has sustained the justiciability of ATCA claims, both before and after Sosa, without requiring exhaustion. See Alperin v. Vatican Bank, 410 F.3d 532, 544-58 (9th Cir.2005); In re Estate of Ferdinand Marcos, Human Rights Litig., 25 F.3d 1467, 1474-76 (9th Cir.1994). Recently, Judge Cudahy of the Seventh Circuit made these observations in an ATCA suit brought by Nigerians against a Nigerian general for alleged torture during the regime of a since-deposed military junta:
[I]ncorporating an implicit exhaustion requirement in the ATCA would have something to recommend it. Doing so would, among other things, bring the Act into harmony with both the provisions of the TVPA (with which it is at least partially coextensive) and with the acknowledged tenets of international law. And while not directly applicable to the ATCA, the TVPA scheme is surely persuasive since it demonstrates that Congress not only assumed that the exhaustion requirements imposed by eus- *1090 tomary international law were discernible and effective in themselves, but also that they should be reflected in U.S. domestic law. Considerations of equity and consistency also recommend this approach since otherwise American victims of torture would be bound by an exhaustion requirement under the TVPA and foreign plaintiffs could avoid such strictures by pleading under the ATCA.
This question is far from settled, however, and the Supreme Court’s decision in Sosa, though suggestive, offers little guidance. While it recognizes the possibility of reading an exhaustion requirement into the ATCA, the Court states only that it “would certainly consider this [exhaustion] requirement in an appropriate ease.” 124 S.Ct. at 2766, n. 21. Other federal courts appear to be less receptive to the idea. In short, it is far from clear that, purely as a matter of United States jurisprudence, the ATCA contains any exhaustion requirement at all.
Enahoro v. Abubakar, 408 F.3d 877, 889-90 (7th Cir.2005) (Cudahy, J., dissenting in part) (footnotes omitted). Other courts have avoided the issue by finding that even if exhaustion were to apply to the ATCA, local remedies would in those cases be futile and therefore need not be exhausted. See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F.Supp.2d 289, 343 n. 44 (S.D.N.Y.2003); see also Enahoro, 408 F.3d at 892 (Cudahy, J., dissenting in part) (“There can be little doubt but that the legal remedies offered by the Nigerian courts were indeed ineffective, unobtainable, unduly prolonged, inadequate or obviously futile under any applicable exhaustion provisions.”).
Congressional intent is of “paramount importance” to any exhaustion inquiry. Patsy v. Bd. of Regents, 457 U.S. 496, 501, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). Where Congress specifically mandates it, exhaustion is required. Coit Independence Joint Venture v. Fed. Sav. & Loan Ins. Corp., 489 U.S. 561, 579, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989); Patsy, 457 U.S. at 502 n. 4, 102 S.Ct. 2557. Congressional intent may be descried from the statutory language, legislative history or recent congressional activity. See Patsy, 457 U.S. at 502 & n. 4, 102 S.Ct. 2557. When Congress has not clearly required exhaustion, sound judicial discretion usually governs. See McGee v. United States, 402 U.S. 479, 483 & n. 6, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971); Porter v. Bd. of Trs., Manhattan Beach Unified Sch. Dist., 307 F.3d 1064, 1070 (9th Cir.2002) (“If a statute does not provide for exhaustion of administrative remedies, a district court may require exhaustion in the exercise of its discretion.”). Although we have discretion, we may not create exhaustion requirements for “policy considerations alone ... unless exhaustion is consistent with congressional intent.” Knight v. Kenai Peninsula Borough Sch. Dist., 131 F.3d 807, 816 (9th Cir.1997) (quoting Patsy, 457 U.S. at 513, 102 S.Ct. 2557).
1. Congressional Intent

a. Statutory Language

The ATCA simply provides that “[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.” 28 U.S.C. § 1350. There is no dispute that the statute does not explicitly require exhaustion.
Rio Tinto, supported by amicus curiae, argues that the statute implicitly requires exhaustion because of the ATCA’s use of the language, “in violation of the law of nations,” and because exhaustion is customary in international law. This argument, adopted by the dissent, has some *1091 appeal. It would make recourse to other, less certain modes of analysis unnecessary. But for reasons we explain below, unlike our colleague in dissent, we are not persuaded.

b. Legislative History

There is complete silence in the ATCA’s legislative history. See, e.g., IIT v. Vencap, Ltd., 519 F.2d 1001, 1015 (2d Cir.1975) (characterizing the ATCA as “a kind of legal Lohengrin ... no one seems to know whence it came”); In re Estate of Marcos, 978 F.2d at 498 (“The debates that led to the Act’s passage contain no reference to the Alien Tort Statute, and there is no direct evidence of what the First Congress intended it to accomplish.”); Tel-Oren, 726 F.2d at 789 (Edwards, J., concurring) (“the legislative history offers no hint of congressional intent in passing the statute”). Therefore, an inquiry into the ATCA’s legislative history is of little help.
As the dissent points out, however, only five years after Congress passed the ATCA, the United States negotiated and signed the Jay Treaty with Great Britain. Treaty of Amity, Commerce and Navigation (Jay Treaty), Nov. 19,1794, U.S.-U.K., 8 Stat. 116. (Dissent at 9003.) Article VI of the Jay Treaty created an international arbitration procedure for pre-Revolution-ary War debts claimed by British creditors against American debtors, but this mechanism could be invoked only if, “by the ordinary course of judicial proceedings, the British creditors cannot now obtain, and actually have and receive full and adequate compensation.... ” 8 Stat. at 119. The dissent argues that Article VI, with its apparent similarity to the modern rule of exhaustion of local remedies, suggests that the First Congress was aware of the principle of exhaustion. But where does that leave us? It may mean that the absence of explicit exhaustion language in the ATCA was purposeful. See Edwards v. Aguillard, 482 U.S. 578, 594, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (“The plain meaning of the statute’s words, enlightened by their context and the contemporaneous legislative history, can control the determination of legislative purpose.”). Put differently, the explicit exhaustion requirement in the Jay Treaty may reveal that the First Congress did not view exhaustion as an automatic rule of customary international law (or “the law of nations” as it was termed at the time). In the dissent’s words, not only the 1991 Congress that passed the TVPA, but also the First Congress that passed the ATCA most likely knew “how to require exhaustion of remedies for torts ‘committed in violation of the law of nations or a treaty of the U.S.’ when it wishe[d] to do so.” (Dissent at 8996.) At best, a comparison between the text of the ATCA and that of the Jay Treaty is inconclusive. We therefore look to more recent pronouncements of congressional intent regarding a possible exhaustion requirement in the ATCA.

c. The TVPA

Congress’ most recent statements regarding a federal cause of action for customary international law violations that occur outside the United States is found in the TVPA, enacted in 1991. The TVPA created an “unambiguous” cause of action for official torture and extrajudicial killing — both violations of customary international law — committed outside the United States. See H.R.Rep. No. 102-367 at 3 (1991), reprinted in 1992 U.S.C.C.A.N. 84, 86 (“The TVPA would establish an unambiguous and modern basis for a cause of action that has been successfully maintained under an existing law, section 1350 of the Judiciary Act of 1789 ....”) (em *1092 phasis added).[23] Unlike the ATCA, the TVPA is available to aliens and U.S. citizens. See H.R.Rep. No. 102-367 at 4, reprinted in 1992 U.S.C.C.A.N. at 86 (“While the Alien Tort Claims Act provides a remedy to aliens only, the TVPA would extend a civil remedy also to U.S. citizens who may have been tortured abroad.”).[24]
Most significantly for our purpose here, the TVPA contains the express exhaustion requirement that the ATCA does not. See 28 U.S.C. § 1350, historical and statutory notes, Torture Victim Protection, Section 2(b) (“A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.”). A House legislative report explains why a TVPA cause of action requires exhaustion, in terms that admittedly could apply to the ATCA as well:
The bill provides that a court shall decline to hear and determine a claim if the defendant establishes that the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred. This requirement ensures that U.S. courts will not intrude in cases more appropriately handled by courts where the alleged torture or killing occurred. It will also avoid exposing U.S. courts to unnecessary burdens, and can be expected to encourage the development of meaningful remedies in other countries.
H.R.Rep. No. 102-367 at 5, reprinted in 1992 U.S.C.C.A.N. at 87-88.[25]
In passing the TVPA, however, Congress did not discuss whether the ATCA, like the TVPA, should (or does) require exhaustion of local remedies. Rather, Congress simply stated generally that the ATCA provides “important uses and should not be replaced,” H.R.Rep. No. 102-367 at 3, 1992 U.S.C.C.A.N. at 86, and that it “should remain intact.” S.Rep. No. *1093 102-249 at 5. Because Congress was obviously aware of the ATCA, it could have amended the statute to include an exhaustion requirement similar to the one contained in the TVPA. See Bates v. United States, 522 U.S. 23, 29-30, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997) (“Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.”) (internal citations and quotations omitted). And if Congress understood that the ATCA already contained an exhaustion provision, it is not clear why it would add a superfluous exhaustion provision to the TVPA. See, e.g., Williams v. Taylor, 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (“[T]he cardinal principle of statutory construction [is] that courts must give effect, if possible, to every clause and word of a statute ....”) (internal citations and quotations omitted).
On the other hand, the TVPA’s legislative history suggests that Congress may have believed that exhaustion of local remedies was required in some situations where U.S. courts are faced with international law claims. See S.Rep. No. 102-249 at 10 (“[A]s this legislation involves international matters and judgments regarding the adequacy of procedures in foreign courts, the interpretation of section 2(b) [(requiring exhaustion)], like the other provisions of this act, should be informed by general principles of international law.”). But upon closer inspection, that legislative history stops short of a broad and unambiguous statement that Congress believed that the satisfaction of the international exhaustion rule was required as a matter of U.S. domestic law before an ATCA claim could be heard in a U.S. court.
In attempting to glean congressional intent with respect to the ATCA from the TVPA’s legislative history, we also note that Congress was targeting only the specific substantive claims of torture and extrajudicial killing: “Official torture and summary executions merit special attention in a statute expressly addressed to those practices.” S.Rep. No. 102-249 at 5; H.R.Rep. No. 102-367 at 4, 1992 U.S.C.C.A.N. at 86. Further, the-TVPA’s exhaustion rule was tailor-made with those substantive international law violations in mind and, at least for some, was not expected to be a significant hurdle for torture victims:
Cases involving torture abroad which have been filed under the Alien Tort Claims Act show that torture victims bring suits in the United States against their alleged torturers only as a last resort. Usually, the alleged torturer has more substantial assets outside the United States and the jurisdictional nexus is easier to prove outside the United States. Therefore, as a general matter, the committee recognizes that in most instances the initiation of litigation under this legislation will be virtually pri-ma facie evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred. The committee believes that courts should approach cases brought under the proposed legislation with this assumption.
S.Rep. No. 102-249 at 9-10 (emphasis added). It appears, then, that when addressing causes of action based on norms of customary international law, Congress has treated different kinds of substantive claims differently — a caution against importing an across-the-board exhaustion requirement into ATCA based on what Congress did in the TVPA.[26]
*1094 Like the First Congress’ intent in passing the ATCA (especially when viewed in the context of the Jay Treaty’s exhaustion requirement), so too Congress’ intent and understanding in 1991 with respect to the ATCA is unclear. Congress may have affirmatively declined to add an exhaustion requirement to the ATCA while incorporating such a requirement in the TVPA. Or Congress may have intended or understood exhaustion to apply to international law-based causes of action across-the-board.[27] But given (i) the lack of express historical or contemporary congressional intent regarding exhaustion under the ATCA, (ii) Congress’ recent pronouncement that the ATCA should remain “intact” and “unchanged” and (iii) Congress’ specific focus in the TVPA on torture and extrajudicial killing, we cannot conclude that legislative intent supports importing an exhaustion requirement into the ATCA.[28] Therefore, we turn to whether we *1095 should import exhaustion into the ATCA as an exercise of judicial discretion.
2. Judicial Discretion
Rio Tinto, amicus curiae and the dissent advance plausible though ultimately unconvincing arguments in favor of requiring exhaustion as an exercise of judicial discretion. The dissent in particular draws upon a plethora of doctrines and sources, making a best case scenario for reading exhaustion into the ATCA. With respect, we believe our colleague overstates the clarity of his case and underplays plausible counterarguments and real ambiguities in international and domestic law. Whether one finds the arguments for or against exhaustion more or less persuasive, however, we conclude that the balance tips against judicially engrafting an exhaustion requirement onto a statute where Congress has declined to do so, and in an area of international law where the Supreme Court has called for the exercise of judicial caution rather than innovation. See Sosa, 542 U.S. at 728, 124 S.Ct. 2739 (“These reasons argue for great caution in adapting the law of nations to private rights.”). This is particularly so given the uncertainties we encountered in our previous discussion of legislative intent regarding the ATCA, because that intent constrains the exercise of our judicial discretion. Cf. Patsy, 457 U.S. at 513, 102 S.Ct. 2557 (holding that, in an administrativo, law setting, “policy considerations alone cannot justify judicially imposed exhaustion unless exhaustion is consistent with congressional intent”).
The central argument Rio Tinto, amicus curiae and the dissent advance to justify exercising judicial discretion is that exhaustion of local remedies is an established aspect of international law. See Enahoro, 408 F.3d at 890 n. 6 (Cudahy, J., dissenting in part) (collecting sources); Interhandel (Switz. v. U.S.), 1959 I.C.J. 6, 27 (Mar. 21); Foreign Relations Law Restatement § 703, cmt. d (“A state may pursue formal, bilateral remedies ... only after the individual claiming to be a victim of a human rights violation has exhausted available remedies under the domestic law of the accused state. International agreements providing remedies to individuals also generally require that the individual first exhaust domestic remedies.”) (internal citations omitted). But see Foreign Relations Law Restatement § 703, cmt. d (“The individual’s failure to exhaust remedies is not an obstacle to informal intercession by a state on behalf of an individual, to unilateral ‘sanctions’ by a state against another for human rights violations, or to multilateral measures against violators by United Nations bodies or international financial *1096 institutions.”); id. § 713, cmt. b (“Formal diplomatic [protection] usually awaits exhaustion of local remedies, but governments often intercede informally without regard to the person’s domestic remedies.”) (internal citations omitted). Consequently, the “law of nations” language in the ATCA allegedly provides courts with the discretion to import an international law doctrine of exhaustion into an ATCA claim along with the substantive cause of action.
Moreover, the argument goes, not only would requiring exhaustion be consonant with international law, but such a requirement would address many of the policy concerns identified by the district court in its decision to dismiss some (or all) claims on political question, act of state and comity grounds. Finally, exhausting local remedies assumedly would encourage the development of effective local criminal and civil penalties for human rights violations.
However, this is a patchwork argument that on closer analysis is less cohesive and unambiguous than it is made out to be, as the following examples illustrate. First, the international law of exhaustion does not compel a U.S. court to apply it in an ATCA cause of action. Exhaustion, to the extent it may be a norm within international human rights law, was developed specifically in the context of international tribunals — such as the Human Rights Committee or the Inter-American Court of Human Rights — which were created through treaties and with the consent of sovereign countries. Even before exhaustion was written into human rights treaties, the norm evolved in the context of international fora and was based on assertions of national sovereignty. See Chit-tharanjan Felix Amerasinghe, Local Remedies in International Law 62 (2d ed. 2004) (“[T]he rule [of local remedies] seems to have become entrenched in response to insistence by host states on powers founded on sovereignty rather than because it emanated from a basic principle of justice inherent in the international legal order.”).
Thus, the international norm of exhaustion does not speak to the hybrid situation before us where a domestic court in a sovereign country, rather than an international tribunal, is charged with adjudicad ing violations of customary international law through the vehicle of a civil suit. Although consideration of other countries’ sovereignty is relevant to our inquiry here as it was in our earlier consideration of act of state doctrine and international comity, the exhaustion limitation imposed on and accepted by international tribunals as a requirement of international law is not dis-positive as to a United States court’s discretion to impose exhaustion as part of the ATCA.[29]
Second, the theory that the “law of nations” language in the ATCA provides a means by which the international law of *1097 exhaustion may be applied domestically overlooks that international exhaustion is procedural rather than substantive. See, e.g., Phosphates in Morocco (Italy v. Fr.), 1938 P.C.I.J. (ser.A/B) No. 74, at 28 (June 14) (holding that international responsibility for a substantive harm incurred upon one state by another attaches at the time of the act and not at a subsequent point after the injured state had been denied justice in the pursuit of local remedies); Amerasinghe, Local Remedies in International Law at 416 (“Judges or states may have made statements supporting the view that the [exhaustion] rule is substantive, but the practice of [international] judicial bodies relating to the rule leads overwhelmingly to the conclusion that the rule has not been treated as substantive or as both substantive and procedural but as solely procedural in character.” (emphasis added)).
The substance-procedure distinction is important in this case because Sosa held that the ATCA “is a jurisdictional statute creating no new causes of action ... [and was] enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time.” 542 U.S. at 724, 124 S.Ct. 2739. None of the substantive definitions of international law violations in modern human rights treaties contain exhaustion as an element of such violations. To the extent the exhaustion requirement appears in such treaties, it appears separately as a general requirement. See, e.g., Optional Protocol to the International Covenant on Civil and Political Rights, art. 2, opened for signature Dec. 16, 1966, 999 U.N.T.S. 302 (“[I]ndividuals who claim that any of their rights enumerated in the Covenant have been violated and who have exhausted all available domestic remedies may submit a written communication to the [Human Rights] Committee for consideration.”); (Dissent at 9005-9007 (collecting sources)). Sosa held that the ATCA provides jurisdiction for a violation of substantive norms comparable to “violation of safe conducts, infringement of the rights of ambassadors, and piracy.” 542 U.S. at 724, 124 S.Ct. 2739.
The exhaustion rule is not like any of those, or modern substantive equivalents such as torture, extrajudicial killing, genocide, slavery, prolonged arbitrary detention and systematic racial discrimination. See Foreign Relations Law Restatement § 702 (cited with approval by Sosa, 542 U.S. at 737, 124 S.Ct. 2739). The Supreme Court has not addressed whether the methodology it employed in Sosa to identify some substantive international norms as falling within the ATCA’s jurisdictional grant is applicable to procedural and other nonsubstantive customary law norms. Although importing exhaustion may serve the cautious ends advocated in Sosa, opening the door through the ATCA to other, nonsubstantive customary international law norms — such as universal jurisdiction — may be more problematic. See id. § 404 cmt. a (“[International law permits any state to apply its laws to punish certain offenses although the state has no links of territory with the offense, or of nationality with the offender (or even the victim). Universal jurisdiction over the specified offenses is a result of universal condemnation of those activities and general interest in cooperating to suppress them, as reflected in widely accepted international agreements and resolutions of international organizations. These offenses are subject to universal jurisdiction as a matter of customary law.”).
Third, the argument that requiring exhaustion will improve compliance with international human rights law in other countries because it provides an incentive *1098 for those countries to improve their legal systems appears plausible on its face. (.See Dissent at 1116-17.) Although advanced with some frequency, however, this argument remains fairly speculative and most often lacks any empirical data showing improvements in the quality or accessibility of local remedies as a result of the application of the local remedies rule at the international level. Cf. Ryan Goodman & Derek Jinks, Measuring the Effects of Foreign Human Rights Treaties, 14 Eur. J. Int’l L. 171,182-83 (2003) (“Public international law desperately needs ... studies that connect the law to events on the ground .... [W]e still do not satisfactorily know the full effects of human rights treaties.”). An alternative and perhaps equally plausible hypothesis is that “[foreign court rulings against rights-abusing defendants have the effect of putting pressure ‘from above’ on the state where the rights abuses occurred.” Ellen Lutz & Kathryn Sikkink, The Justice Cascade: The Evolution and Impact of Human Rights Trials in Latin America, 2 Chi. J. Int’l L. 1, 4 (2001); see also id. at 24-25, 30 (discussing the possibility that the arrest and near trial of General Pinochet in Europe and European court cases against Argentine military officers were catalysts in Chile and Argentina, respectively, for more aggressive pursuit of human rights suits in those countries). If this alternative hypothesis were true, the absence of the exhaustion rule, not its presence, would contribute to the development of effective remedies for human rights abuses.[30]
Finally, and most importantly, notwithstanding there are policy reasons that favor judicially creating an exhaustion requirement for ATCA suits, such questions of policy bring us back to the legislative choice Congress could have easily made, but did not, in 1991 when it passed the TVPA and commented on the use and purpose of the ATCA.[31] Recognizing the *1099 delicate balance between judicial innovation and the “discretion of the Legislative and Executive branches in managing foreign affairs,” Sosa, 542 U.S. at 727, 124 S.Ct. 2739, the Supreme Court pointedly-said about the ATCA that it “would welcome any congressional guidance in exercising jurisdiction with such obvious potential to affect foreign relations.... ” Id. at 731, 124 S.Ct. 2739; see also id. at 726, 124 S.Ct. 2739 (“[T]he general practice [has been] to look for legislative guidance before exercising innovative authority over substantive law.”). Absent any clear congressional guidance on importing a blanket exhaustion requirement into the ATCA, Sosa counsels against doing so by judicial fiat — especially when Congress has not seen fit to do so when it had the opportunity.[32]
We therefore conclude that it would be inappropriate, given the lack of clear direction from Congress (either in 1789 or when it revisited the issue in 1991), and with only an aside in a footnote on the issue from the Supreme Court, now to superimpose on our circuit’s existing ATCA jurisprudence an exhaustion requirement where none has been required before. See, e.g., Alperin v. Vatican Bank, 410 F.3d 532, 544-58 (9th Cir.2005); In re Estate of Ferdinand Marcos, Human Rights Litig., 25 F.3d 1467, 1474-76 (9th Cir.1994). Notwithstanding our dissenting colleague’s scholarship, which goes far beyond what was presented in the briefs, we take the Supreme Court’s admonition of caution in Sosa to heart and decline to read an exhaustion requirement into the ATCA, leaving it to Congress or the Supreme Court to take the next step, if warranted.[33]
F. Whether the District Court Properly Denied Leave to File an Amended Complaint Is Moot
Federal Rule of Civil Procedure 15(a) provides that a trial court shall grant leave to amend freely “when justice so requires.” See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (“[T]his mandate is to be heeded.”). “[L]eave to amend should be granted if it appears at all possible that the plaintiff can correct the defect.” Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir.2000) (en banc) (internal citations and quotations omitted).
Given our conclusion that the dismissal of some of the plaintiffs’ claims be reversed and the case remanded for further proceedings, the plaintiffs’ appeal on this ground is moot. However, the plaintiffs *1100 should have an opportunity to file a new proposed amended complaint upon remand.

III. CONCLUSION

We REVERSE the district court’s dismissal of all claims as nonjusticiable political questions. We REVERSE the district court’s dismissal of the racial discrimination claim on act of state grounds. We VACATE the district court’s dismissal of the racial discrimination claim on comity grounds, and its dismissal of the UNCLOS claims on act of state and comity grounds, for reconsideration in light of this opinion. We AFFIRM the district court’s conclusion that the ATCA does not contain an exhaustion requirement.

. The plaintiffs, who appear as appellants and cross-appellees in this appeal, will be referred to as "plaintiffs” throughout.

. A jus cogens norm "is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.” Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 714 (9th Cir.1992) *1075 (quoting Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679).

. If we were affirming the district court's dismissal on justiciability grounds, we could avoid this issue, as there is no violation of "the rule that a federal court may not hypothesize subject-matter jurisdiction for the purpose of deciding the merits” if the court affirms the district court without reaching the merits. Hodgers-Durgin v. De La Vina, 199 F.3d 1037, 1042 n. 3 (9th Cir.1999) (en banc). However, because we reverse the district court’s dismissal, we must ensure that jurisdiction lies.

. The Supreme Court ultimately concluded that under this standard, the petitioner’s claim for arbitrary arrest and detention was not cognizable under the ATCA. Sosa, 542 U.S. at 737-38, 124 S.Ct. 2739.

. We further note that violations of the law of nations have always encompassed vicarious liability. See 1 Op. Att'y Gen. 57, 59 (1795) (explaining that "jurisdiction [has been] expressly given to [United States] courts in all cases where an alien sues for a tort only, in violation of the laws of nations, or a treaty of the United States" and noting that "those who commit!], aid[], or abet[] hostilities” have "rendered] themselves liable to punishment under the laws of nations”). Indeed, Congress passed a specific statute criminalizing aiding and abetting for one of the "paradigm” ATCA causes of action, piracy. See Act of April 30, 1790, ch. 9 § 10, 1 Stat. 114 (criminalizing aiding and abetting piracy).

. We do not reach the separate question, which has not been presented to us on appeal, of what standard must govern such determinations of liability. Whether and how the plaintiffs will be able to prove their dramatic allegations are questions for another day.

. We do not address the second and third Baker factors, as Rio Tinto does not contend they are applicable.

. As discussed infra, the act of state doctrine also involves a determination of the political repercussions of judicial action, and in that context courts have held that statements of interest, although entitled to respect, are not conclusive. See Allied Bank Int'l v. Banco Credito Agricola de Cartago, 757 F.2d 516, 521 n. 2 (2d Cir.1985) (“This estimation [of the applicability of the act of state doctrine] may be guided but not controlled by the position, if any, articulated by the executive as to the applicability vel non of the doctrine to a particular set of facts. Whether to invoke the act of state doctrine is ultimately and always a judicial question.”); Environmental Tectonics v. W.S. Kirkpatrick, Inc., 847 F.2d 1052, 1062 (3d Cir.1988) (holding that the State Depart-merit’s legal conclusions “are not controlling on the courts,” but that its "factual assessment of whether fulfillment of its responsibilities will be prejudiced by the course of civil litigation is entitled to substantial respect”). The Supreme Court also recently stated in the context of assertions of foreign sovereign immunity that "should the State Department choose to express its opinion on the implications of asserting jurisdiction over particular petitioners in connection with their alleged conduct, the opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy.” Republic of Austria v. Altmann, 541 *1081 U.S. 677, 702, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) (emphasis in original omitted).

. In UUngaro-Benages the court ultimately dismissed the claims on comity grounds. Id. at 1240.

. The SOI adds that "[c]ountries participating in the multilateral peace process have raised this concern” as well.

. We address below the separate question of whether the act of state or international comity doctrines warrant dismissal due to a balancing of the interests of PNG and the United States.

.We need not determine whether a refusal to honor an explicit request to dismiss would constitute sufficient "disrespect” to warrant dismissal under this factor, although we note the Second Circuit's conclusion in Kadic that it would not. Kadic, 70 F.3d at 250.

. The plaintiffs have submitted recent letters from members of PNG's government urging that the suit will not harm or affect the ongoing Bouagainville peace process. The Chief Secretary to the Government of PNG, Joseph Kalinoe, wrote to the United States Ambassador to PNG on March 30, 2005 that "the [PNG Government] does not see the case presently before the U.S. courts in the U.S. affecting diplomatic and bilateral relations between our two countries nor does it see it affecting the peace process on the island of Bougainville.” And on January 8, 2005, John Momis, the Interim Bougainville Provincial Governor, wrote to the State Department's legal advisor under whose name the SOI was written, "urgfing] the Government of the United States to support the Prime Minister's position to permit the case to proceed in the courts of America, and to explain that the people of Bougainville strongly desire the case to proceed in America. ...” Momis' letter includes detail about the current state of the Bougainville peace process, and about how "the litigation has not hindered or in any way adversely affected the peace negotiations.” Indeed, the letter adds that "the Sarei litigation has helped facilitate the process as it is viewed as another source of rectifying the historic injustices perpetrated against the people of Bougainville.” Finally, the letter asserts that "the only way that the litigation will impact [U.S./PNG] foreign relations is if the litigation is discontinued.”
Whether these letters are properly authenticated is in dispute. But if they are authentic and their authors accurately describe the current state of affairs in PNG, that would seriously undercut the State Department’s concerns expressed in its November 5, 2001 SOI — which itself depended on assessments by local government officials, including Joseph Kalinoe’s predecessor as Chief Secretary to the Government of PNG. For whatever reason, the State Department has declined to update the SOI. Under these circumstances, we do not rely on the letters' substantive representations. But the letters, by suggesting there exists today a different reality in PNG from that portrayed in the SOI, illustrate why it is inappropriate to give the SOI final and conclusive weight as establishing a political question under Baker.

. We also recalled Baker’s warning against "sweeping statements that imply all questions involving foreign relations are political ones” and its command to courts to undertake a "case-by-case analysis to determine whether the question posed lies beyond judicial cognizance.” 410 F.3d at 544-45. We characterized the dissent, which "would have the political question doctrine remove from our courts all matters that fall by their constitutional DNA into th[e] sphere of conduct involving foreign relations,” id. at 547 (internal quotations omitted), as setting forth "an over-inclusive approach [that] threatens to sweep all cases touching foreign relations beyond the purview of the courts — a practice warned against in Baker.” Id.

. Rio Tinto has not appealed the nondismis-sal of the war crimes and violations of the laws of war claims under the act of state doctrine, but argues against it only in response to the plaintiffs' appeal as to the act of state dismissals.

. The agreement is codified in the Bougain-ville Copper Agreement Act.

. Our circuit has not explicitly held that district court dismissals or refusals to dismiss on the ground of international comity are reviewed for abuse of discretion, although it has settled that comity decisions in general are reviewed under that standard. See, e.g., Stock West Corp. v. Taylor, 964 F.2d 912, 917-18 (9th Cir.1992) (regarding comity owed to state courts). We join our sister circuits in clarifying that this abuse of discretion review applies to dismissals on grounds of international comity as well.

. Once again, Rio Tinto failed to appeal the district court's comity ruling, confining its arguments against it to its response to plaintiffs’ appeal. See supra notes 15 & 17.

. We also note that whether the presence of a conflict is a predicate inquiry, or simply one factor in a multipart inquiry, is academic here, as the district court did not abuse its discretion in identifying a conflict.

. A "compensation claim” is defined to include any claim "in connection with” a mining project "which relates to or concerns” environmental harm, takings, or, more broadly "extends to any other matter” or "seeks the payment of damages, compensation or any other form of monetary relief.”

. As noted above, see supra note 15, Rio Tinto has waived any appeal of the district court’s failure to dismiss the war crimes and violations of the laws of war claims on act of state grounds. We note, however, that the act of state doctrine has been interpreted to apply only to legitimate acts of warfare. See, e.g., Linder v. Portocarrero, 963 F.2d 332, 336 (11th Cir.1992) (holding that "there is no foreign civil war exception to the right to sue for tortious conduct that violates the fundamental norms of the customary laws of war”); see also Flatow v. Islamic Republic of Iran, 999 F.Supp. 1, 24 (D.D.C.1998) (concluding that political assassinations "are not valid acts of state of the type which bar consideration of this case”). Because such conduct violates jus cogens norms, it does not constitute an official act. See, e.g., Siderman de Blake, 965 F.2d at 715-18.

. As with the act of state claims, Rio Tinto has failed to appeal the district court's ruling, but argues in response to the plaintiffs’ arguments that the district court inappropriately failed to dismiss the war crimes and violations of the laws of war claims on comity grounds. Even if Rio Tinto had not waived any appeal, the district court did not abuse its discretion in failing to dismiss these claims on comity grounds.

. The ambiguity alluded to arose from Judge Bork's concurring opinion in Tel-Oren, 726 F.2d at 799, where he held that the ATCA and its reference to the law of nations did not amount to a congressional grant of a cause of action. In Congress’ words, ‘‘[t]he TVPA would provide such a grant.” H.R.Rep. No. 102-367 at 4, 1992 U.S.C.C.A.N. at 86; see also 28 U.S.C. § 1350, historical and statutory notes, Torture Victim Protection, Section 2 Establishment of civil action. The ambiguity has also been resolved by the Supreme Court's interpretation of the ATCA in Sosa:
[A]lthough the [ATCA] is a jurisdictional statute creating no new causes of action, the reasonable inference from the historical materials is that the statute was intended to have practical effect the moment it became law. The jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time.
542 U.S. at 724, 124 S.Ct. 2739.

. Compare 28 U.S.C. § 1350, historical and statutory notes, Torture Victim Protection, Section 2(a) (TVPA) ("An individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to torture ... or ... extrajudicial killing shall, in a civil action, be liable for damages ....”) with 28 U.S.C. § 1350 (ATCA) ("The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.”) (emphasis added).

. Congress also included an exhaustion requirement in another statute involving claims of human rights violations against foreign states, the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, et seq. Under the FSIA, a court shall decline to hear a case alleging specified human rights abuses against a foreign sovereign unless that sovereign is designated as a state sponsor of terrorism and the plaintiff has afforded the sovereign "a reasonable opportunity” to arbitrate the claim.” 28 U.S.C. § 1605(a)(7)(B)(i).

. Despite the dissent’s assertion to the contrary (Dissent at 1104), we agree that the *1094 TVPA has expanded rather than narrowed U.S. remedies for torture and extrajudicial killing overseas. First, the TVPA created remedies for U.S. citizens never available to them under the ATCA. Second, aliens had only what Congress considered an ambiguous right to bring torture claims under the ATCA because of Judge Bork’s opinion in Tel-Oren. Thus, the TVPA confirmed the existence of a clear, safe-harbor cause of action for alien victims of torture and extrajudicial killings. The passage of the TVPA can be said to be a narrowing of an alien’s remedies for torture in U.S. courts only if, after the TVPA, an alien can no longer bring a torture claim under the ATCA. This was the Seventh Circuit's conclusion in Enahoro. See 408 F.3d at 886 ("It is hard to imagine that the Sosa Court would approve of common law claims based on torture and extrajudicial killing when Congress has specifically provided a cause of action for those violations...."). Rio Tinto has not made this latter argument, and we are not endorsing such a result.
We do not read torture and extrajudicial killing out of the ATCA, as the dissent claims. (Dissent at 1105.) That issue is not squarely before us, and we note that Enahoro’s resolution of the complexities that result from the apparent overlap between the TVPA and the ATCA may not be the only appropriate approach — a clear safe harbor statute need not eclipse the more general and ambiguous statute that preceded it.
Lastly, the dissent’s argument that "[i]f the majority is correct, Congress has made it more difficult for aliens to bring torture claims into U.S. courts because now (under TVPA) they must first exhaust their remedies, whereas previously (under ATCA) they did not” is deeply ironic. (Dissent at 1104 n. 4.) This is actually one of the premises of the dissent's approach — not ours. We hold that exhaustion is not required at this time under the ATCA. It is the dissent that would import exhaustion into the ATCA (which may or may not encompass torture claims after the TVPA) and make it more difficult to bring torture or any other ATCA claim in U.S. courts.

. The dissent's invocation of the Charming Betsy interpretive doctrine in light of the ambiguity in congressional intent is not quite on point. See Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.”). (Dissent at 1105-06.) Though reading exhaustion into the ATCA would be consistent with international law norms, failing to read exhaustion into the ATCA would not violate those norms.

. The dissent is incorrect in its assertion that we "infer[] that exhaustion, which was expressly included in TVPA, must necessarily have been left out of ATCA, which has no exhaustion requirement.” (Dissent at 1104.) All that we can conclude with any certainty from the TVPA is that it does not answer the question of what Congress intended with respect to an exhaustion requirement in the ATCA. Furthermore, our reasoning has little connection to that of Papa v. United States, 281 F.3d 1004 (9th Cir.2002), where we read the statute of limitations from the TVPA into the ATCA. (Dissent at 1105.) The question of whether there should be a limitations period was never considered by Papa. Relying on North Star Steel Co. v. Thomas, 515 U.S. 29, 33, 115 S.Ct. 1927, 132 L.Ed.2d 27 (1995) ("[Ojften federal statutes fail to provide any limitations period for the causes of action they create, leaving courts to borrow a period *1095 ... to limit these claims.”) (cited by Papa, 281 F.3d at 1012 n. 30), Papa assumed that like any other civil cause of action considered by the Supreme Court, an ATCA suit must have a limitations period. Therefore, Papa was left only with the question of how long that limitations period should be. If the ATCA is to have an imported exhaustion requirement, then the TVPA may be a good source for determining the standards of that requirement. But this does not answer the antecedent question of whether exhaustion should be imported into the ATCA in the first instance. Lastly, we acknowledge that it is hazardous to attempt to gauge congressional intent from silence or comments expressed in the context of another statute’s legislative history, but we must make do with the meager legislative history available to us. Moreover, it seems no more hazardous than the dissent’s preference for reading a new requirement into a law that does not explicitly provide for it. "If Congress intended to do something different, let Congress fix it.” Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Servs., Inc., 448 F.3d 1092, 1100 (9th Cir.2006) (Bybee, J., dissenting from denial of rehearing en banc).

. The dissent's suggestion that”[n]othing in Sosa or ATCA indicates that this distinction [between domestic and international tribunals] matters,” (Dissent at 1112), misses the point. Sosa did not hold simply that the “ATCA was written in order to bring the law of nations into American courts” (Dissent at 1112), but that only some portions of the law of nations are brought into American courts through the ATCA. See Sosa, 542 U.S. at 720, 725, 124 S.Ct. 2739. If in determining which portions of the law of nations are usable for ATCA purposes, we rely upon sound judicial discretion (as argued at length by the dissent at 1113-22), we should not be lulled into a false sense of familiarity with the term "exhaustion” just because it is the same term that we use to describe an analogous doctrine in our domestic law. Although the concepts of exhaustion may be analogous in the international and domestic spheres, they are not identical, and the international law of exhaustion has developed in part as a result of uniquely international concerns.

. This premise is consistent with the rules of the two ad hoc international criminal tribunals, for the former Yugoslavia and Rwanda, which establish the "primacy” of the respective international criminal tribunal over its national counterpart without regard for the international rule of exhaustion. See International Criminal Tribunal for the former Yugoslavia, Rules of Procedure and Evidence, pt. 2, rules 8-13, U.N. Doc. IT/32/Rev.7 (1996), entered into force Mar. 14, 1994, as amended Jan. 8, 1996, available at http: //www 1 .umn.edu/humanrts/icty/ct-rules7.html; International Criminal Tribunal for Rwanda, Rules of Procedure and Evidence, pt. 2, rules 8-13, U.N. Doc. ITR/ 3/REV.l (1995), entered into force June 29, 1995, available at http://wwwl.umn.edu/hum-anrts/africa/ RWANDAl.htm.

. Many of the policy arguments in favor of exhaustion — including (i) the dissent's concern with "undermining] local governments” (Dissent at 1115), (ii) "single-handedly derailing] diplomacy” (Dissent at 1121), (iii) the inability of courts "to make ... subtle adjustments in response to national and world events” (Dissent at 1121) and (iv) the premise that "[a] lawsuit in U.S. courts will rarely be the best way to resolve supranational conflicts” (Dissent at 1116) — apply nearly as well to ATCA (and TVPA) cases where local remedies have been exhausted.
Further, because of the "futility” exception to the exhaustion rule, see Foreign Relations Law Restatement § 703 cmt. d ("That [exhaustion] requirement is met if it is shown that [no domestic remedies are] available or that it would be futile to pursue them.”), many potential human rights cases brought under the ATCA will be excused from satisfying the exhaustion requirement altogether even if we were to read it into the statute— thus side-stepping exhaustion’s purported benefits. And for those countries where evidence of the futility of requiring exhaustion is less clear cut, ATCA plaintiffs and defendants will no doubt ask U.S. courts to conduct "sensitive inquiries into the internal affairs of other countries” (Dissent at 1119) to determine the adequacy of those countries' legal and political systems. In sum, die proffered exhaustion rule may not accomplish quite so much as the dissent predicts.

. Sosa, rather than the administrative law cases relied upon by the dissent, dissent at 1103 (citing McCarthy v. Madigan, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) (quoting Patsy, 457 U.S. at 501, 102 S.Ct. 2557), superseded by statute as stated in Booth v. Churner, 532 U.S. 731, 739, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)), is the appropriate starting point for determining the scope of our discretion with respect to the ATCA. Given the specialized jurisprudence developing around the ATCA, we question whether Patsy and McCarthy’s holdings regarding judicial discretion to impose exhaustion of administrative remedies can be uncritically transferred to the international law context.

. Cf. Eberhart v. United States, -U.S. -, -, 126 S.Ct. 403, 407, 163 L.Ed.2d 14 (2005) (per curiam) (“Although we find its disposition to have been in error, ... the Seventh Circuit felt bound to apply [precedent], even though it expressed grave doubts.... This was a prudent course. It neither forced the issue by upsetting what the Court of Appeals took to be our settled precedents, nor buried the issue by proceeding in a summary fashion. By adhering to its understanding of precedent, yet plainly expressing its doubts, it facilitated our review.")